Please Int __CA__

Cause No. A2020-0236-MDL

| | | |
|---|---|---|
| **IN RE: TPC GROUP LITIGATION** | § § § § § § | **IN THE DISTRICT COURT OF** |
| | | **ORANGE COUNTY, TEXAS** |
| | | **128ᵀᴴ JUDICIAL DISTRICT** |

## FIFTH AMENDED MASTER CONSOLIDATED PETITION AND JURY DEMAND WITH CERTIFICATES OF MERIT AND CURRICULUM VITAE OF MR. EDWARDS, P.E.

**TO THE HONORABLE COURT:**

Plaintiffs _____ (collectively, "Plaintiffs") complain of the actions of the Defendants **TPC GROUP, INC., TPC GROUP, LLC; JOSHUA NEHLIG (collectively referred to as "TPC"); SK SECOND RESERVE, LP f/k/a SK CAPITAL PARTNERS, LP; FIRST RESERVE CORPORATION, LLC; FR SAWGRASS, LP; FIRST RESERVE MANAGEMENT, LP; SK SAWGRASS, LP; TPC HOLDINGS, INC., f/k/a SAWGRASS HOLDINGS, INC.; SAWGRASS MERGER SUB INC.; SAWGRASS HOLDINGS, LP; FR XII ALPHA AIV, LP; and FR XII-A ALPHA AIV, LP. (all ten preceding defendants collectively referred to as "Owners"); SAWGRASS HOLDINGS GP LLC; NALCO CO., LLC ("NALCO"); INGENERO, INC. ("INGENERO"),** and **SUEZ WTS USA, INC.** (all seventeen defendants named herein collectively referred to as "Defendants"), as follows:

### PARTIES

1. Plaintiff, **VICTIM NAME**, is a citizen of Texas and resident of CITY, COUNTY, Texas.

2. Defendant **TPC GROUP, INC. ("TPC INC.")**[1] is a for-profit corporation organized and existing under the laws of the State of Texas, with its headquarters and corporate office at 500 Dallas Street, Suite 1000, Houston, Texas 77002. TPC INC. is deemed both a resident

---

[1] Plaintiffs' counsel conferred with counsel for TPC INC. in prior litigation after, in an unverified email, TPC INC.'s counsel averred it was not a proper party. The undersigned offered to nonsuit this entity with a tolling agreement to terminate upon final judgment or settlement of the last remaining party in the case (since there was no sworn testimony or evidence supporting the unverified email)—a standard offer routinely accepted. TPC INC.'s counsel refused.

1

and citizen of Texas. At all relevant times, TPC INC. operated (and continues to operate) refineries and chemical plants throughout the United States with several locations in Texas including, *inter alia*, a plant in Jefferson County, Texas that experienced two explosions on November 27, 2019. Defendant TPC INC. has been served with Citation and appeared in this litigation. This Defendant may be served through its counsel of record via the e-serve filings.

3.     Defendant **TPC GROUP, LLC ("TPC LLC")** is a for-profit limited liability company organized and existing under the laws of the State of Texas, with its headquarters and corporate office at 500 Dallas Street, Suite 1000, Houston, Texas 77002. TPC LLC is deemed both a resident and citizen of Texas. At all relevant times, TPC LLC operated (and continues to operate) refineries and chemical plants throughout the United States with several locations in Texas including, *inter alia*, a plant in Jefferson County, Texas that experienced two explosions on November 27, 2019. Defendant TPC LLC has been served with Citation and appeared in this litigation. This Defendant may be served through its counsel of record via the e-serve filings.

4.     Defendant **SK SECOND RESERVE, LP f/k/a SK CAPITAL PARTNERS, LP ("SK Capital"),** is a Delaware limited partnership with a principal place of business in New York, New York. According to its website, https://skcapitalpartners.com, Defendant SK Capital is a private investment firm focused on the specialty materials, petrochemicals, and pharmaceutical sectors. SK Capital is a for-profit, United-States-based company that describes itself as a "private investment firm with a disciplined focus on specialty materials, chemicals and healthcare sectors."[2]   SK Capital claims its "integrated, multi-disciplinary team utilizes its industry, operating, and investment experience to help transform businesses into higher performing organizations."[3] SK Capital is a limited partnership that has appeared in this matter only to assert

---

[2] *SK Capital Partners Completes Acquisition of TPC Group Inc.*, SKCAPITALPARTNERS.COM (Dec. 20, 2012, https://skcapitalpartners.com/sk-capital-partners-completes-acquisition-of-tpc-group-inc/.
[3] *Id.*

2

**Exhibit C**                                                                  APP 264
DO NOT COPY OR ALTER - This document contains security features.

a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

5.      Defendant **FIRST RESERVE CORPORATION, LLC ("First Reserve")** is a Delaware limited liability company with principal places of business in Houston, Texas and Stamford, Connecticut. According to its website, https://www.firstreserve.com/about, First Reserve is "a leading global private equity investment firm exclusively focused on energy [w]ith over 35 years of industry insight, investment expertise and operational excellence."[4] Defendant First Reserve partnership has appeared in this matter only to assert a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

6.      Defendant **FR SAWGRASS, LP ("FR Sawgrass")** is a for-profit, United-States-based company affiliated with First Reserve that describes itself as "a leading global private equity investment firm exclusively focused on energy [w]ith over 35 years of industry insight, investment expertise and operational excellence."[5] FR Sawgrass is a for-profit limited partnership that has appeared in this matter only to assert a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

7.      Defendant **FIRST RESERVE MANAGEMENT, LP ("FR Management")** is a for-profit, United-States-based company affiliated with First Reserve that describes itself as "a leading global private equity investment firm exclusively focused on energy [w]ith over 35 years of industry insight, investment expertise and operational excellence."[6] FR Management is a for-profit limited partnership that has appeared in this matter only to assert a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

8.      Defendant **SK SAWGRASS, LP ("SK Sawgrass")** is a for-profit, United-States-based company affiliated with SK Capital that describe themselves as a "private investment firm

---

[4] *About First Reserve*, FIRSTRESERVE.COM, https://www.firstreserve.com/about (last visited April 22, 2021).
[5] *Id.*
[6] *About First Reserve*, FIRSTRESERVE.COM, https://www.firstreserve.com/about (last visited April 22, 2021).

3

**Exhibit C**                                                                 APP 265
**DO NOT COPY OR ALTER - This document contains security features.**

with a disciplined focus on specialty materials, chemicals and healthcare sectors."[7] SK Capital claims its "integrated, multi-disciplinary team utilizes its industry, operating, and investment experience to help transform businesses into higher performing organizations."[8] SK Sawgrass is a for-profit limited partnership that partnership that has appeared in this matter only to assert a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

9.    Defendant **TPC HOLDINGS, INC., f/k/a SAWGRASS HOLDINGS, INC. ("TPC Holdings")** is a for-profit, United-States-based holding company that owns and/or owned TPC Group, Inc. which, in turn, owns Defendant TPC LLC. TPC Holdings is a for-profit Delaware corporation that has answered and appeared in this matter and may be served through its counsel of record via the e-serve filings.

10.    Defendant **SAWGRASS MERGER SUB, INC. ("Sawgrass Sub")** is a for-profit, United-States-based holding company that owns and/or owned TPC Holdings, Inc. which, in turn, owns Defendant TPC LLC. Sawgrass Sub is a for-profit Delaware corporation that has answered and appeared in this matter and may be served through its counsel of record via the e-serve filings.

11.    Defendant **SAWGRASS HOLDINGS, LP ("Sawgrass Holdings LP")** is a for-profit, United-States-based holding company that owns and/or owned TPC Holdings, Inc. which, in turn, owns Defendant TPC LLC. Sawgrass Holdings is a for-profit limited partnership that has answered and appeared in this matter and may be served through its counsel of record via the e-serve filings.

12.    Defendant **FR XII ALPHA AIV, LP ("FR XII")** is a Cayman Islands limited partnership that acquired TPC Group, Inc. on September 21, 2012. FR XII is a limited partnership that has appeared in this matter only to assert a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

---

[7] *SK Capital Partners Completes Acquisition of TPC Group Inc.*, SKCAPITALPARTNERS.COM (Dec. 20, 2012, https://skcapitalpartners.com/sk-capital-partners-completes-acquisition-of-tpc-group-inc/.
[8] *Id.*

4

**Exhibit C**                                           APP 266
**DO NOT COPY OR ALTER - This document contains security features.**

13.     Defendant **FR XII-A ALPHA AIV, LP ("FR XII-A")** is a Cayman Islands limited partnership that acquired Defendant TPC INC. on September 21, 2012. FR XII-A is a limited partnership that has appeared in this matter only to assert a special appearance and may be served through its counsel of record by Rule 11 agreement of counsel.

14.     Defendant **SAWGRASS HOLDINGS GP LLC** (sometimes referred to as **"Sawgrass Holdings GP"**) is a for-profit, United-States-based holding company that controls Defendant TPC LLC on behalf of the Owners through the Board of Managers of Sawgrass Holdings GP LLC. Sawgrass Holdings GP has answered and appeared in this litigation. This Defendant may be served through its counsel of record via the e-serve filings.

15.     Defendant **NALCO CO., LLC ("NALCO")** is a limited liability company with its principal place of business at 1613 West Diehl Road, Naperville, Illinois 60563. NALCO conducts operations, in part, from its facilities in the Houston metropolitan area. Defendant NALCO has answered and appeared in this litigation. This Defendant may be served through its counsel of record via the e-serve filings.

16.     Defendant **INGENERO, INC. ("INGENERO")** is a Delaware corporation with its principal place of business at 4615 Southwest Frwy., #320 Houston, Texas 77027. Defendant Ingenero has been served with Citation and appeared in this litigation. This Defendant may be served through its counsel of record via the e-serve filings.

17.     Defendant **JOSHUA NEHLIG ("NEHLIG")** is a Texas citizen residing in Jefferson County, Texas. Joshua Nehlig has been served with Citation and appeared in this litigation. This Defendant may be served through his counsel of record via the e-serve filings.

18.     Defendant **SUEZ WTS USA, INC. ("SUEZ")** is a foreign corporation with its principal place of business at 4636 Somerton Rd., Trevose, PA. 19053-6742. SUEZ conducts operations, in part, from its facilities in the Houston metropolitan area. SUEZ has answered and appeared herein and may be served through his counsel of record via the e-serve filings.

5

## VENUE, JURISDICTION, AND THESE CLAIMS ARE NOT PROPOSED TO BE TRIED JOINTLY

19.     Venue is proper in Jefferson County, Texas, pursuant to Section 15.002(a)(1) of the TEXAS CIVIL PRACTICE AND REMEDIES CODE in that all, or a substantial part of, the events or omissions giving rise to the cause of action occurred in Jefferson County, Texas.

20.     Venue also is proper in Jefferson County, Texas pursuant to Section 15.002(a)(2) of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, in that Jefferson County is the county of Defendant NEHLIG'S residence at the time the cause of action accrued, and this defendant is a natural person. This Court already ordered that by filing directly into this MDL Court, Plaintiffs are not waiving right to seek remand to counties of proper venue.

21.     At all times relevant to this case, Defendants had an agent or transacted business in the State of Texas, including Jefferson County, Texas. Plaintiffs are Southeast Texas residents who suffered personal injuries, property damages, economic damages, business interruption or loss of wages, relocation expenses, and/or other damages to be specified at the time of trial in Jefferson County as a result of the explosions and releases made the basis of this lawsuit—all or a substantial part which occurred in Jefferson County, Texas.

22.     This Court has personal jurisdiction over Defendants because at all relevant times, they conducted (and continue to conduct) business in Jefferson County, Texas. The causes of action asserted arose from, or relate to, purposeful acts committed by Defendants in Texas because TPC, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, NALCO, Ingenero and SUEZ executed their contracts, and all Defendants conducted business within, the State of Texas. TPC's, Owners', Sawgrass Holdings GP LLC's, NALCO's, Ingenero's, SUEZ's, and Nehlig's negligence and/or gross negligence while conducting their business within the State of Texas is the basis of the Plaintiffs' causes of action.

6

**Exhibit C**                                                  APP 268
**DO NOT COPY OR ALTER - This document contains security features.**

23.     TPC, Owners, including but not limited to Sawgrass Holdings LP, Sawgrass Holdings GP LLC, NALCO, Ingenero, SUEZ, and Nehlig and are subject to personal jurisdiction in Texas under, *inter alia*, the "specific jurisdiction" test because they purposefully availed themselves of the protection of Texas laws by doing business within Texas, have the requisite minimum contacts with Texas, and because the claims made the basis of this lawsuit relate to TPC's, Owners', Sawgrass Holdings GP LLC's, NALCO's, Ingenero's, SUEZ's and Nehlig's business activities—namely the ownership and/or operation of plants and industrial services businesses—within Texas. TPC, Owners, Sawgrass Holdings GP LLC, NALCO, Ingenero, SUEZ, and Nehlig could reasonably anticipate being hailed into a Texas court, and this Court's exercise of jurisdiction over Defendants does not offend the notions of fair play or substantial justice. Defendants are essentially at home in the State of Texas.

24.     NALCO's, Ingenero's, SUEZ's, Owners,' including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's liability is several and independent from that of TPC. Stated differently, NALCO, Ingenero, SUEZ, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP, would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

25.     This is neither a class action, nor a mass action, under the "CLASS ACTION FAIRNESS ACT" ("CAFA"). No class allegations are brought herein, and no class certification is sought. Federal jurisdiction—including alleged jurisdiction under CAFA—is wholly lacking, and any removal would be in bad faith. Specifically, and without limitation, this is not a proposed class action and CAFA excludes cases under the "discretionary exception," the "local controversy exception," and the "home-state controversy exception," all of which would apply here were this

7

**Exhibit C**                                                          APP 269
**DO NOT COPY OR ALTER - This document contains security features.**

*Petition* misread to be under CAFA.[9] The claims herein are governed by the laws of Texas, are pleaded in good faith based on the facts of the in-state explosions, and are brought in a forum with a district nexus to all Plaintiffs, the alleged harm, and Defendants.

26.     This also is not a mass action under CAFA. Plaintiffs DO NOT propose to try their claims jointly (or with any other similar claims, for that matter), and expressly disavow any interpretation of this *Petition* to the contrary. To be clear, Plaintiffs DO NOT propose to try all these cases jointly together (or with any other cases). Instead, Plaintiffs suggest these claims may be "consolidated or coordinated solely for pretrial proceedings" consistent with CAFA 28 U.S.C. § 1332(d)(11)(B)(i) & § 1332(d)(11)(B)(ii)(II), (IV). Finally, Plaintiffs specifically aver that "all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State" consistent with CAFA's § 1332(d)(11)(B)(ii)(I). Any attempt to remove this *Petition* under CAFA is in direct contravention to these specific allegations rejecting CAFA removal jurisdiction and would be brought in bad faith.

27.     Notably, Defendants are Texas-based, non-diverse Defendants who reside, are headquartered, formed under the laws of, and/or essentially at home in Texas and, as such, are subject to Texas state court jurisdiction as "local defendants." Further, as to the ten (10) Owner-Defendants ("Owners") including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, by virtue of their acts, such as ownership and decision-making control and/or managerial authority and/or assumption and/or usurpation of safety and management duties including turnaround governance arising out of TPC management duties, have purposely engaged in the conducting of business in and throughout the State of Texas and have purposefully availed

---

[9] *See* 28 U.S.C. Section 1332(d)(3).

8

Exhibit C

DO NOT COPY OR ALTER - This document contains security features.

themselves of the State's jurisdiction. Indeed, Owners, including but not limited to Sawgrass

Holdings LP and Sawgrass Holdings GP LLC, and TPC are fused for jurisdictional purposes due

to the Owners' and Sawgrass Holdings' LP's and Sawgrass Holdings GP LLC's control over the

internal business operation and affairs TPC beyond their role as investors.

**FACTS**

### A.   TPC

28.     At about 1:00 a.m. on November 27, 2019, TPC's plant in Port Neches, Jefferson

County, Texas experienced an explosion that caused significant damage and perpetrated a loud

blast wave and damage far beyond the confines of its premises. Specifically, TPC's Port Neches

operations site located at 2102 TX-136 Spur, Port Neches, TX 77561 (the "plant") suffered an

explosion involving a processing unit. Later that day, about twelve hours after the first explosion,

another explosion ripped through TPC's Port Neches plant. The blasts caused personal injuries,

bodily injuries, property damage, toxic and/or chemical releases and exposures, and a litany of

other injuries and damages. TPC's exploded Port Neches plant not only caused significant property

damage to surrounding areas but released unknown substances into the environment that adversely

effected Plaintiffs' health, property, income, and other pecuniary interests. Preliminary tests

revealed that TPC's explosions and subsequent activities released 1,3-butadiene, benzene and

other harmful substances into the air, water, and on nearby properties, exposing large swathes of

the nearby Texas population and Texas properties.

29.     But the story starts long before those holiday blasts forever changed Port Neches.

For years, TPC was fined—repeatedly—for violating laws and regulations that were supposed to

keep everyone safe. It took little time before the Texas Tribune, just a few days after the explosions,

uncovered TPC's long, sad history of repeated safety and pollution violations:

> Though the exact cause of the fire and explosions, which injured
> several workers and residents, is still unknown, local emergency
> response officials said it had been traced to a processing unit that
> held butadiene, a colorless gas used to make rubber and plastics that

9

**Exhibit C**                                        APP 271

**DO NOT COPY OR ALTER - This document contains security features.**

is a known human carcinogen. The first explosion took place around 1 a.m. The second occurred Wednesday afternoon, prompting mandatory evacuations within a 4-mile radius of the plant in Port Neches, Groves, Nederland, and northern Port Arthur.

**Online records show TCEQ has penalized TPC Group's Port Neches facility at least 18 times in the past decade, including three times this year. Most of the penalties are for air pollution events the agency found to be avoidable.** The last federal censure TPC faced was in 2017 when it was ordered under a consent decree to pay a civil penalty of $72,187, make various equipment upgrades and spend no less than $275,000 on fenceline monitoring[10] for butadiene.[11]

Apparently, none of TCEQ's eighteen (18) penalties mattered to TPC.

30.     On November 27, 2019, Jefferson County Judge Branick—within moments of TPC's first explosion—texted Jim Arisco that the first explosion "Blew my doors in…literally." Moments later, a friend of Judge Branick *over in Orange County* said this: "Hey Judge, everything ok? That explosion woke me up all the way in Vidor." At 8:25 p.m. that night, Judge Branick told Zach Johnson that TPC's explosion "Blew my doors off my house." Subsequently, Judge Branick entered an order declaring Jefferson County to be in a state of disaster and issued mandatory evacuation and curfew orders "because of the extreme hazard potential that exists as a result of the explosion at the TPC facility in Port Neches, Texas:"

---

[10] EPA, *Fenceline Monitoring* (May 11, 2018), https://www.epa.gov/sciencematters/fenceline-monitoring.
[11] Kiah Collier, *Port Neches plant rocked by multiple explosions has history of environmental missteps*, The Texas Tribune (Nov. 27, 2019; updated Dec. 6, 2019), https://www.texastribune.org/2019/11/27/texas-plant-rocked-explosions-mandatory-evacuations-ordered/ (emphasis added).

10

**Exhibit C**                                                                      APP 272

**DO NOT COPY OR ALTER - This document contains security features.**

OFFICE OF DISTRICT CLERK



**JEFF R. BRANICK**
County Judge

Jefferson County Courthouse
P.O. Box 4025
Beaumont, TX 77704

Beaumont (409) 835-8466
Pt. Arthur (409) 727-2191 Ext. 8466
Facsimile (409) 839-2311

November 27, 2019

Governor Greg Abbott
c/o Nim Kidd, TDEM          FAX: 512-424-2444

RE: Jefferson County Declaration of Disaster

Dear Governor Abbott,

On November 27, 2019 I as County Judge of Jefferson County entered an Order declaring Jefferson County to be in a state of disaster (copy attached) because of the extreme hazard potential that exists as a result of the explosion at the TPC facility in Port Neches, TX. I also issued a mandatory evacuation order and curfew order because of the potential of life-threatening injuries and damage that existed. I have attached a copy of these orders for your consideration.

We are requesting that you extend your prompt attention in this regard and assist Jefferson County and your assistance in this regard will be greatly appreciated. If you require anything further, please contact me in my office.

Sincerely,

Jeff Branick
County Judge, Jefferson County

31.     The explosions and ensuing contamination, danger, and ongoing threat was so severe that the United States Coast Guard issued this Marine Safety Information Bulletin "Channel Closure—Neches River:"

11

CERTIFIED COPY

**Exhibit C**                                                    APP 273

**DO NOT COPY OR ALTER - This document contains security features.**

OFFICE OF DISTRICT CLERK

**Marine Safety Information Bulletin**
**20-19**
**November 27, 2019**

Channel Closure
Neches River

Due to an explosion, fire and air plume from Texas Petrochemical (TPC), the Captain of the Port (COTP) Marine Safety Unit Port Arthur has established a safety zone on the Neches River between Light 20 at FINA anchorage and Light 29 at PETCO Bend. No persons or vessels may enter, transit through or remain in the safety zone without the permission of the COTP.

As of 9 a.m., on scene reports and weather conditions are such that vessels are being allowed to transit through the safety zone on a case by case basis. Vessels desiring to transit through the safety zone should contact the on scene patrol vessel, or Vessel Traffic Service (VTS) Port Arthur on VHF-FM Channel 65A or by phone at (409) 719-5070. Mariners should be prepared to alter their transit plans should conditions change.

32.     TPC not only failed to prevent the explosions at its Port Neches plant, it failed to control the fires and failed to control the continued release of dangerous chemicals and substances including, but not limited to, 1,3-butadiene. The Agency for Toxic Substances and Disease Registry ("ATSDR"), a federal public agency for the United States Department of Health and Human Services, noted:

> **The Department of Health and Human Services (DHHS), IARC, and EPA have determined that 1,3-butadiene is a human carcinogen.**
> Studies have shown that workers exposed to 1,3-butadiene may have an increased risk of cancers of the stomach, blood, and lymphatic system.
> Animal studies found increases in a variety of tumor types from exposure to 1,3-butadiene.[12]

33.     It is undisputed that TPC released 1,3-butadiene and an extraordinarily large amount of dangerous chemicals and substances into the air, land, and water in the surrounding area—including the area inhabited by Plaintiffs and/or their Texas properties. Several days after

---

[12] CDC, *ToxFAQs for 1, 3-Butadiene* (Sept. 2009), https://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=458&tid=81 (emphasis added).

CERTIFIED COPY

**Exhibit C**        APP 274

**DO NOT COPY OR ALTER - This document contains security features.**

the initial explosions, the situation became so dire another shelter-in-place and voluntary evacuation order was issued for TPC's cancer-causing 1,3-butadiene:

**From:** City of Port Neches <noreply@ci.port-neches.tx.us>
**Sent:** Wednesday, December 4, 2019 6:09 PM
**To:** jbranick@co.jefferson.tx.us
**Subject:** Shelter in Place



# PORT NECHES

Due to the current wind conditions and on-going activities at the TPC site, there are elevated levels being measured for 1,3-Butadiene. Many of you can probably smell the odor. As a precaution, we are recommending sheltering in place until 6 am in the morning. The situation will be evaluated throughout the night and will be reassessed in the morning. Further information will be provided as it becomes available. Sheltering in place means that you should shut all windows and doors and shut off your A/C units.

This e-mail has been sent to you by the CITY OF PORT NECHES. To maximize their communication with you, you may be receiving this e-mail in addition to a phone call with the same message. If you no longer wish to receive email notifications from CITY OF PORT NECHES, please click here to unsubscribe.

To view the CITY OF PORT NECHES privacy policy, please click here.

34. Later, the authorities re-evaluated the voluntary evacuation order implemented as a result of TPC's failure to prevent 1,3-butadiene from leaking out of its exploded plant, and decided to keep it in place:

This is an update for the voluntary evacuation that is currently in place. Air monitoring has been continuing throughout the night. There has been a decrease in overall levels, but the butadiene remains at detectable levels. The highest readings continue to be in the Earle/Merriman/Saybrook area. The voluntary evacuation will remain in effect. We will continue to monitor the situation and provide updates when conditions have changed. Thank you again for your patience.

35. Notably, TPC admitted during this leak that the amounts of 1,3-butadiene were having health-effects on humans (*i.e.*, "greatly reduced" to now merely "irritating"):

Throughout the morning, TPC staff have been working to stop leaks that contributed to the elevated levels of 1,3-Butadiene in the City of Port Neches. As a result of the actions taken, the levels have now been greatly reduced to non-irritating amounts. Air monitoring will continue to ensure the levels are being maintained at their current measurements. Due to the improved current conditions, the City of Port Neches and Jefferson County Judge Branick are lifting the shelter in place and voluntary evacuation order for the City of Port Neches.

13

**Exhibit C**     APP 275

**DO NOT COPY OR ALTER - This document contains security features.**

36.     Around this same time, however, TPC was already receiving—and privately sharing with county officials—air-monitoring results that showed significantly increased levels of not only 1,3-butadiene, but benzene, MTBE, and a host of other dangerous (and some cancer-causing) chemicals into community. For example, *inter alia*, in a December 5, 2019 "Preliminary Analytical Data Summary" report that TPC's testing company, CTEH,[13] reported to TPC the following air sampling results for volatile organic compounds ("VOC's"):

Table 2: Summary of Analytical Sampling Detections –Volatile Organic Compounds (VOCs)

| Analyte | Count of Samples | Count of Detections | Average of Detections | Detection Range |
|---|---|---|---|---|
| 1,2,4-Trimethylbenzene | 121 | 71 | 0.10498 ppbv | 0.0601 –0.274 ppbv |
| 1,3-Butadiene | 121 | 60 | 7.35481 ppbv | 0.0603 –102 ppbv |
| Benzene | 121 | 105 | 0.37253 ppbv | 0.0728 – 6.16 ppbv |
| Butane | 121 | 103 | 4.55015 ppbv | 0.602 – 31.6 ppbv |
| Ethylbenzene | 121 | 47 | 0.11476 ppbv | 0.0603 –0.392 ppbv |
| MTBE | 121 | 20 | 1.26357 ppbv | 0.0645 –17.5 ppbv |
| Napthalene | 121 | 9 | 2.43333 ppbv | 0.229 – 10.2 ppbv |
| M&p-Xylene | 121 | 83 | 0.23839 ppbv | 0.0948 – 1.2 ppbv |
| o-Xylene | 121 | 68 | 0.11828 ppbv | 0.0634 – 0.365 ppbv |

As shown, almost half the samples tested positive for 1,3-butadiene, and 105 of 121 samples tested positive for benzene. Regardless of whether these are "actionable" levels, this information was withheld by TPC who would later instruct its CTEH "hired specialists" to conceal these detections from the community through deceptively tailored "talking points."

37.     Plaintiffs' counsel, through Public Information Requests ("PIRs") and Freedom of Information Act Requests ("FOIA's"), obtained thousands of documents relevant to the initial plume movement being reported to TPC, TPC's attempt to downplay both the damage done and the risk to the community, and its limp attempts to feign cleanup and claims processes. Of course, TPC did not initially provide any of these documents to Plaintiffs' counsel.

---

[13] CTEH is an entity typically aligned with corporations and defendants in litigation defending large explosions, pollution, contamination, or adverse effects on human health in communities. CTEH recently defended a large spillage of MTBE (banned for use in the United States) into the Houston Ship Channel. CTEH was hired—as here—by the corporations to try to mitigate the fallout from that massive disaster. And there, as here, CTEH's limited sampling and testing was only shared with the corporate tortfeasors who hired it.

14

**Exhibit C**                                                    APP 276

DO NOT COPY OR ALTER - This document contains security features.

38.    NOAA provided to TPC preliminary plume reports on 11/28/19 that "[p]arts of Port Neches, Nederland, Port Acres, and Taylors Landing are in the plume trajectory, as well as Jack Brooks Regional Airport" then later that day found that the "…main trajectory of the plume will continue to spread mainly to the west and across the mid county area including Jack Brooks Regional Airport, Nederland, and Port Neches …." NOAA later noted shifting of the plume toward Beaumont: "… forecast shows plume gradually shifting from Nederland/far southside of Beaumont to more southern/central portions of Beaumont over the next 12 hours." Later NOAA reports tracked the plume shifting from a south to north orientation, extending into Orange County with, of course, the brunt of the plumes being borne by Jefferson County residents. More troubling than the sweeping, meandering path of TPC's plume and contaminants around Jefferson and Orange Counties—and the concentration, *inter alia*, in Jefferson County—is that NOAA reported to TPC on 11/29/19 that "[h]igher concentrations will be trapped closer to the surface as a temperature inversion persists overnight."   Stated differently, Jefferson County citizens, like Plaintiffs, who inhabit the area "closer to the surface" would be bearing the brunt of TPC's plume and released chemicals. Worse, TPC concealed from Plaintiffs and area residents the test results that identified harmful chemicals being released into the community. For example, in a "News Release #8—Saturday Evening Update," which inexplicably carries the Jefferson County government seal on it, TPC announced on November 30, 2019 that the "insurance adjusters" would be there to inspect properties and CTEH, the corporate fixer, would be there to "conduct debris assessments."

15

CERTIFIED COPY

**Exhibit C**

<u>**DO NOT COPY OR ALTER - This document contains security features.**</u>



OFFICE OF DISTRICT CLERK

**News Release #8 – Saturday Evening Update**
For release at 9:00 p.m.
November 30, 2019

**Beaumont, Texas** – Response measures are ongoing and Unified Command remains focused on mitigating the event and maintaining the safety of responders and the community. The following information provides an update to residents regarding the claims process activities.

Tomorrow (Sunday), insurance adjusters will begin visiting area residents to assess any damage as a result of the recent event at TPC Group's Port Neches Operations.

Claims representatives were in the field today confirming the areas of highest impact. Adjusters will begin door-to-door visits tomorrow, and continue for several days, going street-by-street in the impact areas. The first areas adjusters will visit include residences within approximately 4,000 feet of TPC Group's Port Neches Operations.

Adjusters are beginning visits tomorrow within the boundaries outlined on the map **attached**. If residents are not home when adjusters visit, a contact card will be left at that residence. A schedule of additional visit areas and lanes will be posted on the Port Neches Response Facebook page and at www.portnechesresponse.com as they are available. Adjusters will attempt to visit residents who have filed claims via the Community Assistance Helpline, as well as those who have not filed claims.

Separately, and also beginning tomorrow (Sunday), residents who contacted the Community Assistance Helpline with concerns about debris on their property, can expect a visit from environmental response specialists CTEH who will conduct debris assessments and will be leading removal efforts. CTEH will be assessing homes and yards within approximately one-half mile of the TPC Port Neches Operations fenceline.

To file a claim for evacuation costs or property damage, or to report debris on your property, please call the Community Assistance Helpline at 866-601-5880.

Updates and information continue to be posted on the web at www.portnechesresponse.com, on Facebook at https://www.facebook.com/portnechesresponse1 and on Twitter at PortNechesUC.

39.     In fact, CTEH-TPC's Hired gun to sound the "all clear" all too soon (as it does for so many other corporate polluters)---was given the following points to blatantly mislead Plaintiffs, and other Southeast Texas residents and property owners:

*Introductory CTEH talking points for verbal delivery in conversation with property owners and residents.*

- Hello. We are with CTEH, environmental response specialists, hired by TPC Group to assess materials or debris on your property that may have resulted from the TPC Port Neches Operations event.
- We will first do a visual assessment of your property and document any debris with photos.
- If any insulation debris are identified in the assessment, we will call in personnel to promptly remove it in accordance with state and federal guidelines.
- Over the past 72 hours, CTEH has conducted air sampling surrounding the event site.
- Air sampling continues to yield non-detectable results, and it verifies no measurable concentrations of asbestos fibers in the air.
- Out of an abundance of caution, and in addition to air sampling efforts, wipe samples of horizontal surfaces will verify the presence or absence of settled fibers using established scientific methods.
- Do we have permission to access your property for this assessment?

16

**Exhibit C**                    APP 278

CERTIFIED COPY

DO NOT COPY OR ALTER - This document contains security features.

40.     Of course, this wasn't true at all—CTEH was finding, and TPC was told of, significant amounts of *detectable* results, certainly not "non-detectable results." Indeed, as can be seen from the foregoing CTEH analytical data that was not shared with the community, it literally listed the positive findings of dangerous chemicals under the column entitled "average number of *detections*." But TPC wasn't just contaminating Jefferson County health and homes—it was also contaminating the schools.

41.     In a December 8, 2019 report, entitled "Preliminary Analytical Air Data Summary" prepared by CTEH for TPC, CTEH found in its air monitoring 100% presence of 1,3-butadiene, benzene, MTBE, and a host of other VOC's in an area elementary school, middle school, and high school:

Six (6) analytical air samples were collected from indoor locations of the following school campuses: Port Neches Middle School, Port Neches Elementary School and Port Neches-Groves High School. These air samples were analyzed for VOCs and a summary of the results are provided in Table 4b.

**Table 4b: Summary of Indoor Analytical Air Sample Detections – Volatile Organic Compounds (VOCs)**

| Analyte | Count of Samples | Count of Detections | Average of Detections | Detection Range |
|---|---|---|---|---|
| 1,2,4-Trimethylbenzene | 6 | 6 | 0.184 ppbv | 0.12 – 0.272 ppbv |
| 1,3-Butadiene | 6 | 6 | 22.683 ppbv | 13.1 – 58.3 ppbv |
| Benzene | 6 | 6 | 0.599 ppbv | 0.371 – 0.847 ppbv |
| Butane | 6 | 6 | 27.083 ppbv | 19.3 – 37.6 ppbv |
| Ethylbenzene | 6 | 6 | 0.157 ppbv | 0.116 – 0.191 ppbv |
| MTBE | 6 | 6 | 0.443 ppbv | 0.295 – 0.783 ppbv |
| Naphthalene | 6 | 3 | 0.276 ppbv | 0.218 – 0.382 ppbv |
| M&p-Xylene | 6 | 6 | 0.496 ppbv | 0.351 – 581 ppbv |
| o-Xylene | 6 | 6 | 0.194 ppbv | 0.141 – 0.217 ppbv |

These nearly 100% detection results—in the local schools—speak for themselves. The day after this report was given to TPC by CTEH, TPC released this statement about air monitoring:

**Air Monitoring update:** Air monitoring around the site and in the community continues to show no actionable butadiene levels. Unified Command, comprised of federal, state, local agencies and TPC Group, remains diligent in efforts to monitor air quality. Monitoring coverage, by various state, federal, and local agencies, extends throughout the county and is providing real-time air quality data to Unified Command.

CERTIFIED COPY

**Exhibit C**

DO NOT COPY OR ALTER - This document contains security features.

Setting aside the definition of "actionable level," the community—and particularly the parents of these children in these schools—deserved to know whether cancer-causing chemicals were detected inside local schools, regardless of whether that level was "actionable" or not. Besides, contrary to CTEH's and TPC's "talking points," these are certainly "detectable" levels contrary to the talking point that "[a]ir sampling continues to yield non-detectable results."

42.  On May 26, 2020, the United States Department of Labor's Occupational Safety and Health Administration ("OSHA") issued a stinging rebuke of TPC's conduct with, of course, more fines for TPC to pay and, ultimately, ignore—par for TPC's merry-go-round of pollution, contamination, explosion, citation, rinse, and repeat. OSHA's first citation, "Citation 1," contains nine (9) separate items (each with their own subparts), all of them labeled as "serious" violations. Here's just the first part of the first citation:

Citation 1 Item 1    Type of Violation: **Serious**

29 CFR 1910.119(f)(1): The employer did not develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information;

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to develop written operating procedures that provided clear instructions for using the bleed valve of the inlet piping to the S4D4 control valve (FV-3718) to unplug/clear the bottom pipe plugged because of polymer including popcorn polymer

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to develop written operating procedures that provided clear instructions for using the bleed valve of the inlet piping to the N4D7 control valve (FV-3618) to unplug/clear the inlet pipe plugged because of polymer including popcorn polymer

(c) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to develop written operating procedures that provided clear instructions for using the bleed valve of the inlet piping to the S4D4 Reflux control valve (FV-3706 / HV-3705) to unplug/clear the reflux pipe plugged because of polymer including popcorn polymer

(d) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to develop written operating procedures that provided clear instructions for throttling the steam turbine pump (6G75) that feeds the N4D7A column due to the control valve (FV-3601) being plugged with polymer including popcorn polymer.

(e) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to develop written operating procedures that provided clear instructions for throttling the steam turbine pump (S4G8) to maintain reflux on S4D4A tower due to the control valve (FC-3706) being plugged with polymer including popcorn polymer.
[14]

_____

[14] *See May 27, 2020 OSHA Citations to TPC.*

18

Not only did TPC fail to develop written operating procedures to help protect from plugging and clogging due to polymer (including popcorn polymer), TPC failed to train employees on the "free-up procedure" for key equipment leading to the explosions:

Citation 1 Item 2   Type of Violation: **Serious**

29 CFR 1910.119(g)(3): The employer failed to ascertain that each employee involved in operating a process has received and understood the training required by this paragraph. The employer did not prepare a record that contained the identity of the employee, the date of the training, and the means to verify that the employee understood the training:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to provide documentation that ascertained that operators have been trained in the S4D4 bottom temporary filters free-up procedure

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to provide documentation that ascertained that operators have been trained in the N4D7 bottom temporary filters free-up procedure

[15] So, armed with no "written operating procedures" and unable to confirm training for the employees operating that equipment, TPC then elected to forego a pre-startup safety review:

Citation 1 Item 3   Type of Violation: **Serious**

29 CFR 1910.119(i)(2)(ii): The employer did not perform a pre-startup safety review to confirm that operating procedures were adequate when the modification was significant enough to require a change in process safety information:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not perform a pre-startup safety review to confirm that the S4D4 Shutdown procedure was adequate.

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not perform a pre-startup safety review to confirm that the N4D7 Operating Guidelines Post Fractionation Service Procedure (Rev. 10/4/2011) was adequate.

[16] As if that wasn't enough, TPC—for the very towers that initially exploded and set off a devastating chain reaction of explosions, fires, chemical releases, and contamination—decided not to inspect or test them:

---

[15] *See May 27, 2020 OSHA Citations to TPC.*
[16] *Id.* at OSHA Citation 1, Item 3.

**Exhibit C**                                         APP 281

**DO NOT COPY OR ALTER - This document contains security features.**

Citation 1 Item 4    Type of Violation: **Serious**

29 CFR 1910.119(j)(4)(i): The employer did not perform inspection and tests on process equipment:

On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not perform inspection and tests on process equipment for the South and North MTBE units to include:

a) S4D2 MTBE South tower.
b) N4D2 MTBE North tower.

[17] Indeed, TPC failed to document any such inspections or tests were performed, including those on the S4D4B tower—a key component to the (first) catastrophic explosion.[18]

43.    TPC's "serious" failures and violations, as found by OSHA, don't end there. TPC operated equipment (to catastrophic failure and explosions) "that were outside acceptable limits:"

Citation 1 Item 6    Type of Violation: **Serious**

29 CFR 1910.119(j)(5): The employer did not correct deficiencies in equipment that were outside acceptable limits (defined by the process safety information on paragraph (d) of this section) before further use

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to correct deficiencies in the 1-2 Butadiene analyzer AI3776 for S4D4 B tower.

[19] TPC's violations spanned the plant, including:

Citation 1 Item 7    Type of Violation **Serious**

29 CFR 1910.119(l)(1) The employer did not implement procedures to manage changes to process chemicals, technology, equipment, and procedures, and changes to facilities that affect a covered process.

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not implement MOC-4397 which required blinding and or un-gapping the North MTBE section to remove from service.

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not implement MOC-4739 which required complete isolation of N4D2, N4F1 and N4F2 and related equipment from all energy sources (hydrocarbon and utilities)

[20] Perhaps most emblematic of TPC's overall decision-making process, however, was its repeated failure to "ensure that the management of change addressed the impact of the change on safety and health:"

---

[17] *See May 27, 2020 OSHA Citations to TPC.*
[18] *Id.* at OSHA Citation 1, Item 5.
[19] *Id.* at OSHA Citation 1, Item 6.
[20] *Id.* at OSHA Citation 1, Item 7.

20

**Exhibit C**                                                    APP 282

**DO NOT COPY OR ALTER - This document contains security features.**

The alleged violations below have been grouped because they involve similar or related hazards that may increase the potential for injury or illness.

Citation 1 Item 8 a Type of Violation: **Serious**

29 CFR 1910.119(l)(2)(ii): The employer did not ensure that the management of change addressed the impact of the change on safety and health:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to address the safety and health impact of the change implemented through MOC-4594 - Install basket strainers at S4D4B bottoms to segregated crude.

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to address the safety and health impact of the change implemented through MOC-4602 - Install temporary basket strainers between the bottoms of N4D7B tower and N4D8 feed.

21

Citation 1 Item 8 b Type of Violation: **Serious**

29 CFR 1910.134(d)(1)(iii): The employer did not identify and evaluate the respiratory hazard in the workplace; including a reasonable estimate of employee exposures to respiratory hazards and identification of the contaminants chemical state and physical form:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not make a reasonable assessment of the respiratory hazards of the exposure to butadiene before instructing employees to change out filters from the bottom of the S4D4 tower.

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer did not make a reasonable assessment of the respiratory hazards of the exposure to butadiene before instructing employees to change out filters from the bottom of the N4D7 tower.

[22] And if that's not enough, TPC apparently decided not to activate the alarm for its uncontrolled butadiene release:

Citation 1 Item 9 Type of Violation: **Serious**

29 CFR 1910.119(n): The employer did not implement an emergency plan for the entire plant in accordance with the provisions of 29 CFR 1910.38:

(a) On or about 11/27/2019, at the TPC Group Port Neches facility, the employer did not activate the alarm to initiate evacuation for a butadiene release in the south 4 group.

23

---

[21] *See May 27, 2020 OSHA Citations to TPC.*
[22] *Id.* at OSHA Citation 1, Item 8.
[23] *Id.* at OSHA Citation 1, Item 9.

21

These are TPC's "serious" violations found by OSHA after the catastrophic explosions and releases of volatile organic compounds including, but not limited to, butadiene. But OSHA wasn't done.

44.     OSHA found in Citation 2 that TPC committed "willful" violations, including the failure to maintain key equipment involved with the catastrophic failures, explosions, and releases at the plant:

Citation 2 Item 1    Type of Violation: **Willful**

29 CFR 1910.119(f)(1): The employer failed to implement written operating procedures for safely conducting activities involved in each covered process:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer failed to implement its Dead Legs in High Purity Butadiene Service procedure to avoid a dead leg on the suction line of the S4G7 pump by flushing and/or by performing the required pump rotation, while the pump was down for maintenance.

[24] More disturbing is that **TPC**, according to OSHA, willfully failed to provide employees with the conditions for which emergency shutdown of key equipment is required:

Citation 2 Item 2    Type of Violation: **Willful**

29 CFR 1910.119(f)(1)(i)(D): The employer did not develop written operating procedures that provide clear instructions for Emergency shutdown including the conditions under which emergency shutdown is required, and the assignment of shutdown responsibility to qualified operators to ensure that emergency shutdown is executed in a safe and timely manner;

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer's S4D4A/B Emergency Shutdown Procedure (Rev. 11/23/2011) did not provide employees with the conditions under which emergency shutdown is required for the S4D4A/B tower

(b) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer's N4D7 Emergency Shutdown procedure (Rev. 10/4/2011) did not provide employees with the conditions under which emergency shutdown is required for the N4D7 tower

(c) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, the employer's S2D1 Emergency Shutdown Procedure (Rev. 10/1/2011) did not provide employees with the conditions under which emergency shutdown is required for the S2D1 tower
[25]

---

[24] *See May 27, 2020 OSHA Citations to TPC.*
[25] *Id.* at OSHA Citation 2, Item 2.

22

**Exhibit C**                                                                    APP 284

**DO NOT COPY OR ALTER - This document contains security features.**

But beyond all these "serious" and "willful" violations by TPC that lead to this catastrophic series of events, TPC's "willful" failure to correct equipment deficiencies operating outside acceptable limits—and exposing that equipment operating outside limits to fire and explosion hazards—perhaps sums up the rogue recklessness with which TPC gambled at its Port Neches plant, with citizens and the environment paying for it:

Citation 2  Item 3   Type of Violation: **Willful**

29 CFR 1910.119(j)(5): The employer did not correct deficiencies in equipment that were outside acceptable limits (defined by the process safety information on paragraph (d) of this section) before further use and did not take necessary means to assure safe operation:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, employees operating the south 4 group and north unit distillation towers including S4D4A/B and N4D7A/B were exposed to fire and explosion hazards when operating the units equipment outside acceptable limits as a result of the presence of polymer including crystalline popcorn polymer.

-In the Alternative-

OSH ACT of 1970 Section (5)(a)(1): The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees due to fire and explosion hazards:

(a) On or about 11/27/2019 and times prior to, at the TPC Group Port Neches facility, employees operating the south 4 group and north unit distillation towers including S4D4A/B and N4D7A/B were exposed to fire and explosion hazards following a release of highly hazardous chemical as a result of the presence of polymer including crystalline popcorn polymer.

Among other methods, a feasible and acceptable abatement method to correct these hazards are to:
1.   Follow the American Chemistry Council (2019) (Butadiene Popcorn Polymer Formation: Prevention/Control - Page 34) recommendations of ways to remove popcorn polymer from a unit to include:
(i)    Mechanical means such as Chipping or hydro-blasting

[26] But when, many years before, TPC touted their growing investment in butadiene and abilities to Owners as having "grown in fees and margins" and a "high return on invested capital[,]" no mention of safety can be found:

---

[26] See May 27, 2020 OSHA Citations to TPC.

**Exhibit C**    APP 285

**DO NOT COPY** OR ALTER - This document contains security features.



[27] And this "disciplined, experienced" management are the executives singled out by OSHA as having committed a litany of "serious" and "willful" violations resulting in these catastrophic explosions, injuries, and contamination—and singled out by OSHA for rife failures to protect not only its workers, but overall safety and health of everyone.

45. Ultimately, OSHA fined TPC a grand total of $514,692 for TPC's litany of "serious" and "willful" violations that lead to the catastrophic explosions, uncontrolled releases, contamination, and pollution inflicted upon citizens and properties, as well as the remarkable injuries and damages inflicted upon its own employees and the surrounding community. That's $514,692 in fines for a company with annual revenues of approximately $1.5 billion.[28] For all these "serious" and

---

[27] *See* TPC GROUP INC. SLIDE PRESENTATION TO INVESTORS AND ANALYSTS, https://www.sec.gov/Archives/edgar/data/1452217/000119312511312188/d256413dex991.htm (last visited April 22, 2021).

[28] Moody's Owners Service, *Moody's places TPC's rating under review for downgrade following the explosion at its Port Neches facility* (Dec. 10, 2019), https://www.moodys.com/research/Moodys-places-TPCs-rating-under-review-for-downgrade-following-the--PR_414333.

CERTIFIED COPY

**Exhibit C**  APP 286

DO NOT COPY OR ALTER - This document contains security features.

"willful" violations that resulted in TPC literally running their plant to catastrophic explosions, OSHA fined TPC only .034% of TPC's annual revenues. That's nothing more than a rounding error for TPC. TPC's same merry-go-round of pollution, contamination, explosion, citation, rinse, and repeat will most likely spin up once more.

## B. The Owners including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC

46.     But TPC wasn't alone—this story starts long before those jarring, holiday explosions that ripped through Port Neches and surrounding areas. Long before these devastating explosions amidst catastrophic failures, SK Capital Partners, LP, in partnership with First Reserve Corporation, took TPC Group private in December 2012.[29]

> TPC Group is a leading producer of value-added products derived from niche petrochemical raw materials such as C4 hydrocarbons into butadiene, butene-1, isobutylene[,] and differentiated isobutylene derivates for use in performance and specialty products in the synthetic rubber, fuels, lubricants, plastic[,] and nylon industries. Headquartered in Houston, [Harris County,] Texas, TPC Group operated three manufacturing facilities and one terminal in the United States and employs over 800 people.[30]

47.     SK Capital[31] is a private investment firm with, in its own words, "a disciplined focus on the specialty materials, chemical[,] and pharmaceuticals sectors."[32] SK Capital "seeks to build strong and growing businesses" by utilizing "its industry, operating[,] and investment experience to identify opportunities to transform businesses into higher performing organizations with improved strategic positioning, growth[,] and profitability as well as *lower operating risk*."[33]

48.     According to its website, "SK Capital's portfolio of businesses generates revenues of

---

[29] Portfolio, *TPC Group*, SKCAPITALPARTNERS.COM, https://skcapitalpartners.com/portfolio/tpc-group/ (last visited Jan. 28, 2021).
[30] *Id.*
[31] SK Capital herein shall include SK Capital, SK Sawgrass, Sawgrass Holdings, TPC Holdings, and Sawgrass Sub.
[32] *SK Capital Partners Announces Promotions* [*January 21, 2021*], SKCAPITALPARTNERS.COM, https://skcapitalpartners.com/sk-capital-partners-announces-promotions/ (last visited Jan. 28, 2021)
[33] *Id.* (emphasis added).

25

approximately $11 billion annually."[34] SK Capital's business model and strategy is to invest in business sectors it knows and understands well.[35] To accomplish its strategy, SK Capital provides its "playbook" to the target company (*i.e.*, TPC Group), which then utilizes said playbook to ". . . generate growth[,] improve operations, [and] employ capital structures that [. . .] will generate an attractive return . . .."[36] SK Capital assists its companies' management, like TPC Group's, and works *collaboratively* with them to identify, develop, and resource initiatives that will derive value.[37] SK Capital specifically targets for ownership companies whose business it understands so it can actively undertake "operational improvement, cash generation[,] and *risk mitigation*" on behalf of its owned companies.[38] All this direction is provided so that the owned corporate asset ("company"), *i.e.*, TPC Group, contributes to SK Capital's multi-billion dollar investment portfolio. Documents identify the following SK Capital entities with ownership interest and/or control over TPC Group and/or its Port Neches plant: SK Capital, SK Sawgrass, Sawgrass Holdings LP, Sawgrass Holdings GP LLC, TPC Holdings, and Sawgrass Sub.

49.     The petrochemical plants in Texas owned and operated by SK Capital—including the TPC petrochemical plant in Port Neches—have a long record of environmental violations. For example, according to EPA data, SK Capital-owned petrochemical plants in the Houston area have increased greenhouse gas emissions by nearly twenty percent (20%) over the past five years to 1.58 million metric tons of carbon dioxide — about the same as burning 1.7 billion pounds of coal.[39] Defendant SK Capital-owned Texas petrochemical plants have paid approximately $1.9 million to settle EPA and Texas Commission on Environmental Quality (TCEQ) violations over the past five years. In

---

[34] *About*, SKCAPITALPARTNERS.COM, https://skcapitalpartners.com/strategy/ (last visited April 22, 2021).
[35] *Strategy*, SKCAPITALPARTNERS.COM, https://skcapitalpartners.com/strategy/ (last visited Jan. 28, 2021).
[36] *Id.*
[37] *Id.*
[38] *Id.* (emphasis added).
[39] *See* the Americans for Financial Reform Education Fund and Food & Water Watch (AFREF/F&WW) analysis of U.S. Environmental Protection Agency (EPA) Toxic Release Inventory (TRI) data in the Enforcement and Compliance History Online (ECHO) database. Comparison to coal from EPA's Greenhouse Gas Equivalencies Calculator at https://realbank reform.org/.

26

**Exhibit C**                                                                                    APP 288

**DO NOT COPY OR ALTER - This document contains security features.**

fact, government agencies determined that six (6) of the seven (7) Defendant SK Capital-owned Houston area petrochemical plants have repeatedly violated the CLEAN AIR ACT, CLEAN WATER ACT, SAFE DRINKING WATER ACT and/or the HAZARDOUS WASTE RESOURCE CONSERVATION AND RECOVERY ACT.[40]

50.     First Reserve,[41] just like SK Capital, its ownership partner in TPC Group, also targets for ownership companies in the energy and (related) industrial markets so that it may employ its "thirty-five (35) years of industry insight, investment expertise and operational excellence."[42] First Reserve claims its "deep industry insight" allows it to become a "partner" to its portfolio's management teams.[43] First Reserve exercises this degree of control so it too may add to its portfolio's value – also in the *billions* of dollars. In partnership with SK Capital, First Reserve acquired an ownership interest in TPC and the TPC petrochemical plant in December 2012 in a deal worth approximately $850 million and took TPC private. As of the date of the TPC petrochemical plant explosions, First Reserve had raised more than $32 billion of aggregate capital and completed over 675 transactions (including platform investments and add-on acquisitions) during its 35-year existence.[44] Its portfolio companies operate on six (6) continents, spanning the energy spectrum from upstream oil and gas to midstream and downstream resources, equipment and services, and associated infrastructure.[45]

51.     SEC Form 8-K identifies an August 24, 2012 *Agreement and Plan of Merger* ("*Merger Agreement*") that identifies holding corporations, limited partnerships, merger subordinates, parent

---

[40] *See, e.g.*, AFREF/F&WW, *Private Equity's Petrochemical Catastrophe in Texas* (Dec. 2019) at 7 (Table 2), https://ourfinancial security.org/wp-content/uploads/2019/12/AFREF-FWW-PEs-Petrochemical-Catastrophe.pdf.
[41] First Reserve herein shall include First Reserve, FR Corp, FR Sawgrass, FR Management, FR XII, and FR XII-A.
[42] *About First Reserve*, FIRSTRESERVE.COM, https://www.firstreserve.com/about (last visited Jan. 28, 2021).
[43] First Reserve, *Competitive Advantage*, Investment Strategy, https://www.firstreserve.com/investment-strategy/competitive-advantage (last visited Jan. 28, 2021).
[44] *Id.*
[45] *Id.*

27

**Exhibit C**                                          APP 289
CERTIFIED COPY

**DO NOT COPY OR ALTER - This document contains security features.**

companies, subsidiaries, and includes, *inter alia,* some entities formed in the Cayman Islands.[46] This agreement identifies FR XII, FR XII-A and SK Capital as entities that "provided limited guarantees in favor of TPC, as well as "guaranteeing the payment of certain monetary obligations."[47] Per the SEC filing, the *Merger Agreement* identifies FR XII, FR XII-A and SK Capital as "Sponsors" who must "capitalize Parent, at or prior to the Closing, with an aggregate cash equity contribution in the amount of $423.7 million... ."[48] These commitments, of course, are in addition to lenders committing "a $250 million senior secured asset-based revolving credit facility and a $600 million senior secured credit facility... ."[49]

52.     Owners including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC exercised control over TPC through the Board of Managers of Sawgrass Holdings GP LLC (the "Board"). The Board, consisted of two (2) members each from Defendants First Reserve and SK Capital, and one from TPC. Mr. Neil A. Wizel, Managing Director at First Reserve, Mr. Jack Norris, a Partner and Managing Director of and/at SK Capital Partners (upon information and belief a.k.a. John A. Norris, Jr.) Tim Day (First Reserve), Phillip McDivitt (SK Capital) and Mr. Edward J. Dineen, the Chairman, President, and Chief Executive of TPC Group (and Chairman of the Board of Managers of Sawgrass Holdings), respectively. Indeed, these board members were joined by Mr. Bart de Jong, TPC's Senior Vice President and Chief Financial Officer, Mr. Charles Graham, Ms. Shelly Heuser, Mr. Courtney Ruth, Ms. Marilyn Moore Basso, Mr. Peter Dumoulin, Ms. Peggy Macatangay—all high ranking TPC executives—Mr. Paul Steen, a First Reserve Director based in nearby Houston, Texas, Mr. Trevor Tamlyn, a former Vice President of First

---

[46] *See* TPC Group Inc., Current Report (Form 8-K) (Aug. 24, 2012). https://www.sec.gov/Archives/edgar/data/1452217/000119312512369953/d403133d8k.htm.
[47] *Id.*
[48] *Id.*
[49] *Id.*

28

CERTIFIED COPY

**Exhibit C**                                                                                    APP 290

DO NOT COPY OR ALTER - This document contains security features.

Reserve Director (then based in nearby Houston, Texas), Mr. Wes Fischer, a Vice President of First Reserve based in nearby Houston, Texas, Mr. Jared Kramer, a principal of SK Capital, and Mr. Sean Lukemire, a former associate of SK Capital **and board observer of TPC Group and/or Sawgrass Holdings LP**. According to TPC's corporate representative, TPC LLC and TPC Inc. did not have their own directors; rather, it was the Board that conducted their business affairs.

53.     Upon information and belief, a **board observer** is

> **"An individual who is permitted to attend and participate in meetings of the board of directors and to receive all information provided to members of the board** (including minutes of board meetings) [ . . .]." [Further, Plaintiff is informed that] "**[a] board observer right** is contained in a stockholders agreement or side letter and **is commonly granted in connection with a private equity or venture capital transaction**, such as a leveraged buyout or minority investment. In these transactions, **a board observer right is often provided to the investor in addition to or in lieu of the right to designate one or more board seats**. A board observer right is requested for a variety of reasons, including the:
>
> Desire of the investor to bring other members of its team to board meetings to provide **more guidance** to the company.
>
> Need to give all investors an **informed voice** when the company has received multiple rounds of venture capital financing and providing board seats to all constituencies would lead to an overcrowded and unmanageable board."[50]

54.     Upon information and belief, Sawgrass Holdings GP LLC was the general partner of Sawgrass Holdings, LP, both of whom would have unlimited liability under well-established black letter Texas law.

55.     As is evidenced, and upon further information and belief, TPC, through its Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC, amounts to

---

[50]   *Board       Observer*,      WestLaw      (online),        https://content.next.westlaw.com/2-501-5854?__lrTS=20210324121308574&transitionType=Default&contextData=(sc.Default)&firstPage=true (emphasis added).

**Exhibit C**                                          APP 291

**DO NOT COPY OR ALTER - This document contains security features.**

nothing more than a tool or business conduit through which Owners, Sawgrass Holdings LP and Sawgrass Holdings GP LLC reap great profit – at the expense of the safety and well-being of Port Neches, Texas, her surrounding environ, and the safe operation of the TPC Port Neches plant and facility. Here, it is apparent that the Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC, through their financial interest, ownership, and control dictate the day-to-day operations and maintain complete governance over TPC and its business affairs such that there is unity between the corporation—TPC LLC—and the shareholder(s)—including but not limited to Owners, Sawgrass Holdings LP and Sawgrass Holdings GP, LLC. Indeed, and to prevent a great injustice, the corporate separateness should be disregarded, where, at the very least, TPC, its Owners Sawgrass Holdings LP and Sawgrass Holdings GP LLC's incestuous relationship as well as their shared undercapitalized, underinsured business model and reckless, money-driven decision making led to the total relegation of safety considerations and corresponding plant failure – explosions and environmental air disaster. Bluntly, TPC, its Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, on the eve of a time for family gathering and thanksgiving, put profits over families and forced the evacuation of thousands across Southeast Texas as said facility spewed toxic smoke and chemicals into the area.

56.     Certainly, the commonality of corporate officers, board members and participants, and especially the improper dictation of corporate spending, *i.e.*, whether TPC may, as necessary, spend monies on necessary turnarounds, which here would have altogether avoided the reasonably foreseeable explosions resulting from a never ameliorated infection of popcorn polymerization at TPC's Port Neches plant.

30

**Exhibit C**                                                                      APP 292
CERTIFIED COPY

DO NOT COPY OR ALTER - This document contains security features.

57.    As set forth and explained at greater length in the preceding paragraphs above, Sawgrass Holdings GP, LLC's board, the membership of which was made up of representatives from Owners and Sawgrass Holdings LP, knew or should have known about the ongoing popcorn polymer infection living in TPC's Port Neches plant. Owners and Sawgrass Holdings LP, by and through the Sawgrass Holdings GP LLC's Board of Mangers knew or should have known that the dangerous popcorn polymer within TPC's Port Neches plant could only be cured with a passivator process, which can only take place during a turnaround. By definition and as understood to be within petroleum refining, "turnaround means a scheduled large-scale maintenance activity wherein an entire process unit is taken off stream for an extended period for comprehensive revamp and renewal."[51] In layman's terms, the only means by which TPC, the Owner Defendants including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC could cure the dangerous popcorn polymer infecting the TPC Port Neches plant required TPC to shut down – such necessarily leading to the loss of revenue (profits).

58.    Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC, by assuming turnaround governance, undertook direct operational control and governing authority over whether or not necessary safety repairs were or were not made at the TPC Port Neches facility by exercising turnaround expense approval and thereby assumed the duty of risk mitigation. Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC were negligent in their undertaking to provide operational improvement and risk mitigation for TPC. TPC's Port Neches plant made requests for necessary capital improvements including, *inter alia,* an operable fire water supply valve, which were denied and/or delayed by

---

[51] Hamed Shahverdi, *Refinery Plant Turnaround; objectives, procedures, highlights, key points and lesson learned,* LinkedIn, available at: https://www.linkedin.com/pulse/refinery-plant-turn-around-objectives-procedures-key-hamed.

31

**Exhibit C**                                                                                      APP 293

**DO NOT COPY OR ALTER - This document contains security features.**

Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC. TPC neither could—nor did—achieve the *"operational excellence"* or properly mitigate risks prior to the explosions and chemical release(s) because Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC demanded TPC increase production all the while *crucially* denying funds to adequately supply the plant with spare parts, such as pumps, *or* perform necessary maintenance needed to keep the plant safe. Owners', including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's negligent acts were carried out through its employees, agents, managers and /or vice-principles who were acting in the course and scope of their employment with these defendants.

59.     Furthermore, Owners, including but not limited to Sawgrass Holdings LP and Defendant Sawgrass Holdings GP LLC, through the Board, controlled the timing of a long-planned turnaround that was necessary to control the popcorn polymerization issues and prevent the explosion at the TPC Port Neches Plant. The minutes of the December 13, 2018, meeting of the Board show that the Board had control over turnarounds and set expenditure limits on annual turnaround costs, and that it had (and exercised) authority over turnarounds that would cost over $5 million. Indeed, Owners' and Sawgrass Holdings LP's control over TPC, through the Sawgrass Holdings GP LLC board is such that TPC was told what pants to wear and when it could wear them. TPC marched to the beat of Owners', Sawgrass Holdings LP and Sawgrass Holdings GP LLC's drum.

60.     Owners, including but not limited to Sawgrass Holdings LP and Defendant Sawgrass Holdings GP LLC knew or should have known of the extreme risks posed by the popcorn polymerization issues and the corresponding risk of a catastrophic explosion. For instance, in the months leading up to the November 27, 2019, explosion, there were turnarounds scheduled or

32

**Exhibit C**                                    APP 294

**DO NOT COPY OR ALTER - This document contains security features.**

planned for September, October and early November of 2019 to address the popcorn polymer issue that was increasing and worsening daily. And yet, the Board repeatedly delayed the turnaround.

61.     The minutes of the December 13, 2018 meeting of the Board also show that the Board voted to change the way it calculates EBITDA[52] so as to exclude turnaround and catalyst amortization in a veiled attempt to make the TPC Port Neches facility appear more profitable. Upon information and belief, the Board repeatedly disregarded safety concerns and planned to delay the turnaround required to address the popcorn polymerization issues into 2020 in order to produce a deceptive and inflated picture of TPC Group's profitability to make the company appear more attractive to prospective buyers. This constituted, *inter alia*, negligence through the law of negligent undertaking as defined by the RESTATEMENT SECOND (2D) OF TORTS §324A as adopted by the Texas Supreme Court.

62.     The acts and/or omissions outlined herein by Sawgrass Holdings LP, Sawgrass Holdings GP LLC and the Owner-defendants acting by and through their owner control were a producing and/or proximate cause of the explosions in the Port Neches Facility and damages to the Plaintiffs. Had the necessary turnaround work been completed to eradicate the popcorn-polymer danger these explosions and damages would not have occurred.

### C. SUEZ Failed to Provide Adequate Chemicals, Equipment and Personnel which Initiated TPC Popcorn Polymer Problem

63.     SUEZ provided chemical vendor services to TPC Group, LLC's Port Neches facility beginning in 2015 until early 2019. During this time SUEZ 's acts and omissions created or contributed to fouling and "popcorn polymer" at the Port Neches facility after the 2017 "South

---

[52] Earnings Before Interest, Taxes, Depreciation, and Amortization (commonly abbreviated EBITDA), is an accounting measure calculated using a company's earnings, before interest expenses, taxes, depreciation, and amortization are subtracted, as a proxy for a company's current operating profitability (*i.e.*, how much profit it makes with its present assets and its operations on the products it produces and sells, as well as providing a proxy for cash flow).

33

Unit" turnaround. The South Unit and popcorn polymer therein is the subject of this litigation.

64.     It is generally recognized and accepted in the chemical treatment vendor industry that once a popcorn infection in butadiene production has become resistant to chemical treatment added to the process chemistry, the only way to stop the proliferation of the popcorn infection is *to shut down the equipment* such that it can be opened, cleaned internally, and undergo a passivation process. Passivation is a chemical cleaning process that removes free iron, other ferrous contaminants, and popcorn seeds from inside the equipment, and will effectively cure a popcorn infection and prevent a reoccurrence

65.     SUEZ undertook the responsibility to advise TPC of the best ways to reduce fouling and prevent polymerization at its butadiene production plant located in Port Neches, Texas. TPC relied on SUEZ for its expertise and recommendations regarding the fouling and polymerization it was experiencing at its Port Neches butadiene facility ("PNO"). As such, SUEZ was intimately familiar with the historical operations at the plant including the polymerization problem and knew or should have discovered through reasonable analysis this increased the risk of equipment rupture and resulting release of toxic and flammable chemicals. Thus, SUEZ knew or should have known it was more likely than not that due to the unmitigated polymerization issue PNO would experience such a rupture and release, yet failed to warn TPC of this increased likelihood and recommend the immediate shutdown of the affected equipment.

66.     SUEZ was negligent in the work it performed for TPC at PNO by failing to add the proper chemicals and the proper amounts of chemicals for the safe processing of butadiene thereby making the plant unsafe and increasing the likelihood that an equipment failure due to polymerization would occur. An equipment failure due to polymerization is, in fact, what occurred and lead to the November 27, 2019 explosions at PNO.

34

**Exhibit C**                                                           APP 296

DO NOT COPY OR ALTER - This document contains security features.

67.     After it was awarded the TPC contract to work at PNO, SUEZ failed to ensure a required solvent, used as an anti-polymerant, and/or polymer inhibitor treatment, was properly added to the process chemistry. Specifically, SUEZ did not replace NMP, used as a solvent, treatment with equivalent solvent treatment after it was awarded contract which resulted in excessive quantities of DEHA being added to solvent as compensation for Suez's inability to provide proper treatment. SUEZ also supplied defective antifoam suspension that contained silica that was "agglomerating and possibly settling out" which significantly reduced the antifoam's efficacy and contributed to unit upsets.

68.     SUEZ failed to inject chemical inhibitors into the process equipment for extended periods of time in 2018 and 2019, which allowed for new or existing popcorn polymer to form or spread throughout the South Unit. SUEZ injected inferior process chemicals with limited efficacy which caused "upsets" in the South Unit. SUEZ utilized inferior chemical injection pumps to inject chemistry into the South Unit which were plagued with mechanical failures. During this time chemical inhibitors were not injected into the process unit allowing for popcorn polymer and other foulants to form. SUEZ failed to maintain the chemical injection pumps causing further reliability issues. During this time chemical inhibitors were not injected into the process unit allowing for popcorn polymer and other foulants to form.

69.     Defendant SUEZ, by its negligence, failed to identify the hazardous condition(s) at PNO and make recommendations for its correction. TPC relied on SUEZ to perform its work in a reasonably prudent manner consistent with recognized and generally accepted good industry safety practices.

70.     While SUEZ knew or should have known that there was an active popcorn polymer infection in PNO's butadiene finishing section at that time, SUEZ also knew or should have known

35

CERTIFIED COPY

**Exhibit C**                                                                                  APP 297

**DO NOT COPY OR ALTER - This document contains security features.**

that TPC did not fully understand or appreciate this fact. Instead of informing TPC of the active popcorn infection and recommending an immediate shutdown, SUEZ allowed TPC to make decisions based on inaccurate information knowing TPC was relying on SUEZ to make sure they had accurate knowledge regarding its plant's process chemistry treatment.

71.    SUEZ—as TPC's chemicals vendor and Subject Matter Expert when the polymerization problem began to develop on a more escalating basis—knew or should have known that such increased the risk of equipment rupture and resulting release of toxic and flammable chemicals. SUEZ knew or should have known it was more likely than not that PNO would experience such a rupture and release due to the unmitigated polymerization issue yet failed to warn TPC of this likelihood and failed to recommend the immediate shutdown of the affected equipment. SUEZ's failure to provide adequate chemicals to replace NMP—used as a solvent—treatment with equivalent solvent treatment actually triggered an active and dangerous popcorn infection that required immediate shutdown, removal, and cleaning to prevent an equipment rupture and loss of containment.

### D. NALCO Failed to Properly Manage the TPC Plant Popcorn Polymer Problem at a Critical Time

72.    By the time of the November 2019 explosions and releases at the TPC Port Neches plant, the TPC plant had had longstanding popcorn polymerization issues. In early 2019, TPC, as part of its ongoing effort to eradicate the popcorn polymerization issues, transitioned its chemistry treatment vendor to Defendant NALCO. NALCO knew "unwanted polymerization (fouling) during butadiene purification is a constant challenge for plant operators."[53] NALCO also recognized that "[a]nother problem encountered in areas where butadiene concentrates, such as the

---

[53]    ECOLAB, *Butadiene Passivation*, Our Solutions, https://www.ecolab.com/solutions/butadiene-passivation#f:/@websolutions=[Butadiene%20Passivation]&f:/@webapplications=[Butadiene] (last visited Feb. 1, 2021).

36

CERTIFIED COPY

**Exhibit C**

APP 298

DO NOT COPY OR ALTER - This document contains security features.

purification section of a butadiene plant, is the presence of popcorn polymer."[54] NALCO knew that employing both microscopic evaluation and the Styrene popcorn test ("SPPT") is the most informative means to test a suspicious sample. Even though TPC operators reported substantial popcorn polymerization to NALCO in the days leading up to the explosions—popcorn that was different from any popcorn they had previously seen—the SPPT was not performed at the TPC Port Neches plant. NALCO understood that "[i]f not passivated or 'killed,' residual popcorn polymer remaining in the tower can promote further popcorn growth."[55]

73.     It is generally recognized and accepted in the chemical treatment vendor industry that once a popcorn infection in butadiene production has become resistant to chemical treatment added to the process chemistry, the only way to stop the proliferation of the popcorn infection is *to shut down the equipment* such that it can be opened, cleaned internally, and undergo a passivation process. Passivation is a chemical cleaning process that removes free iron, other ferrous contaminants, and popcorn seeds from inside the equipment, and will effectively cure a popcorn infection and prevent a reoccurrence.

74.     In early 2019, TPC contracted with NALCO for NALCO to be responsible for the following at its Port Neches facility:

- conducting new process chemistry trials,
- developing new process chemistry,
- analyzing foulant material,
- maintaining chemical injection pumps,
- conducting a best practices gap analysis,

---

[54] *Id.*
[55]     ECOLAB, *Butadiene Passivation*, Our Solutions, https://www.ecolab.com/solutions/butadiene-passivation#f:@websolutions=[Butadiene%20Passivation]&f:@webapplications=[Butadiene] (last visited Feb. 1, 2021).

37

**Exhibit C**                                                      APP 299
**DO NOT COPY OR ALTER - This document contains security features.**

- verifying chemical pump injection rates,

- monitoring solvent quality,

- monitoring tower and exchanger performance,

- establishing, monitoring, and reporting meaningful process chemistry key process/performance indicators and key stress indicators,

- maintaining appropriate process chemical inventory and reporting on daily and monthly consumption,

- providing relevant training material regarding Butadiene polymer fouling, and

- ensuring there were adequate spare pumps and equipment on site.

75.     By the summer of 2019, NALCO knew, or should have known, that the finishing section of TPC's Port Neches facility, including S4D4 A&B towers, was so overwhelmingly infected with active popcorn seeds that the only way to ensure the towers could continue to perform safely was to *shut them down*, clean them out, and passivate them. Instead of recommending to TPC that the S4D4 A&B towers be immediately shutdown, cleaned, and passivated, NALCO continued to provide *and charge* TPC for process chemistry treatment it knew, or should have known, would be ineffective.

76.     In the fall of 2019, TPC's Port Neches plant began experiencing a polymer issue that was different than anything they had seen before. In an effort to understand what was occurring, TPC asked NALCO to advise them how this polymer was forming, how to minimize its formation, and expound upon why it was different. Instead of providing meaningful answers and sound advice, NALCO's response was, *inter alia*, "[t]he Port Neches site is always making cool stuff."[56] Although NALCO knew that employing both microscopic evaluation and the SPPT is the most informative means to test a suspicious sample, such evaluation and testing was not performed for the popcorn the TPC Port Neches plant operators reported to NALCO in the days leading up to the

---

[56] NALCO, rather than approach this now obviously dangerous phenomena with corresponding seriousness, viewed the popcorn polymer infection as a curiosity.

**Exhibit C**                                                                    APP 300

**DO NOT COPY OR ALTER** - This document contains security features.

explosions—popcorn that was different than any popcorn they had seen previously.

77.    While NALCO knew or should have known that there was an active popcorn polymer infection in the Port Neches plant's butadiene finishing section at that time, NALCO also knew, or should have known, that TPC did not understand or appreciate this fact. Instead of informing TPC of the active popcorn infection and recommending an immediate shutdown, NALCO allowed TPC to make decisions based on inaccurate information with full knowledge that TPC was relying on NALCO to make sure TPC had accurate knowledge regarding its plant's process chemistry.

78.    Thus, NALCO was intimately familiar with the historical operations at the plant including the polymerization problem and knew, or should have known, this increased the risk of equipment rupture and resulting release of toxic and flammable chemicals. NALCO also knew, or should have known, it was more likely than not that TPC's Port Neches plant would experience such a rupture and release due to the unmitigated popcorn polymerization issue, yet failed to warn TPC of this likelihood and recommend the immediate shutdown of the affected equipment.

**E.    *Ingenero Also Failed to Properly Manage the TPC Plant Popcorn Polymer Problem at a Critical Time***

79.    During the relevant time, TPC also hired Defendant Ingenero to provide engineering services and partner with TPC to oversee the butadiene production at TPC's Port Neches plant. Defendant Ingenero agreed to make its own observations and recommendations concerning the Port Neches plant's process operations and chemistry.

80.    In its work, Defendant Ingenero reviewed daily operator logs, process operations, and process chemistry data. Based upon its review and exercising its engineering judgement, Defendant Ingenero reported its daily observations and made recommendations it determined necessary for the safe and efficient operation of the Port Neches plant. Like NALCO, Ingenero knew, or should have known, that the finishing section of TPC's Port Neches facility, including the S4D4 A&B towers, was so badly infected with active popcorn seeds that the only way to ensure

39

the towers could continue to perform safely was to *shut them down*, clean them out, and passivate them.

81.     But instead of recommending to TPC that the S4D4 A&B towers be immediately shutdown, cleaned, and passivated, Ingenero continued to provide and charge TPC for engineering services it knew, or should have known, would be ineffective. While Ingenero knew, or should have known, that there was an active popcorn polymer infection in TPC's Port Neches plant's butadiene finishing section at that time, Ingenero also knew, or should have known, that TPC did not understand or appreciate this fact. Instead of informing TPC of the active popcorn infection and recommending an immediate shutdown, Ingenero allowed TPC to make decisions based on inaccurate information. Ingenero knew, or should have known, TPC was relying on Ingenero to make sure TPC had accurate knowledge regarding its Port Neches plant's process operations and chemistry.

82.     Plaintiffs live near the TPC plant, suffering personal injuries, property damages, diminution in value, loss of income, damages to or loss of income from a business, relocation expenses, and/or other pecuniary damages as a direct result of the explosions, for which they are entitled to recover. Plaintiffs also seek a public trial on these matters, so that Defendants' wrongful conduct can be brought to light to try to prevent the next catastrophe, or at least prevent the compounding of catastrophic explosions with the pernicious inability to tell the truth to keep the public safe, tell the truth before, during and after a disaster, and prevent collusion with certain experts and community members to downplay the level of damage and contamination, and the ongoing risk to health and damage wrought by corporate misconduct.

83.     Plaintiffs have just begun to pour through thousands and thousands of pages of records— many of which suggest there could be other persons or entities that significantly contributed to this disaster. Nothing in this *Petition* should be read to discount or dispel the responsibility of others

40

**Exhibit C**                                                                                                                                 APP 302
**DO NOT COPY OR ALTER - This document contains security features.**

until Plaintiffs have had a full and fair opportunity to extract from Defendants and others all the information related to these explosions. Hundreds of thousands of dollars in Texas-imposed penalties did nothing to compel TPC to simply comply with the law and safely operate this plant. TPC's callous non-compliance with the law—and the bare minimum to keep Texas citizens safe—must come to an end. Not after a few more impotent fines. Not after a few more wagging fingers. Not later. Now.

## CLAIMS AND CAUSES OF ACTION
### COUNT I
### NEGLIGENCE/GROSS NEGLIGENCE
### (AGAINST DEFENDANT TPC)

84.     The preceding factual statements and allegations are incorporated by reference.

85.     At all times material hereto, TPC was under a duty to utilize reasonable care in the operation of its Port Neches, Texas plant.

86.     TPC's plant operations obligated it to protect Plaintiffs, who were within the appreciable zone of risk created by TPC's activities and would foreseeably be exposed to harm due to those risks.

87.     TPC was under a duty of care to refrain from negligent conduct that would cause explosions resulting in injuries, damages, contamination, and/or pollution of the nearby residents, their property, and others including, but not limited to, Plaintiffs.

88.     TPC was under a duty to exercise reasonable care while owning, operating, maintaining, selecting, inspecting, operating, and/or supervising the personnel/equipment/procedures/protocols/maintenance related to the plant.

89.     TPC knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs, Plaintiffs' children, Plaintiffs' property, nearby residents' health and property, businesses, the land, the water, the environment, and others.

41

90.     TPC failed to exercise reasonable care while participating in its plant operations, thereby breaching the duties it owed to Plaintiffs and others in the community.

91.     TPC failed to exercise reasonable care while conducting plant operations to ensure that the explosions did not occur, thereby further breaching the duties it owed to Plaintiffs and others in the community

92.     TPC failed to exercise reasonable care to ensure the plant would be secure from explosions or failures, and its operations/effects would be safely secured within its premises, thereby further breaching the duties it owed to Plaintiffs and others in the community.

93.     TPC failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures, personnel, equipment, inspections, and resources were readily available to prevent and/or mitigate the effects of uncontrolled explosions, thereby further breaching the duties it owed to Plaintiffs and others in the community, including, *inter alia*:

   a) Failing to properly maintain, monitor, inspect, equip, man, supervise, staff, or otherwise control the operations of its plant and/or personnel and/or others;

   b) Operating or permitting its plant to operate in such a manner that explosions occurred, causing damage and injury to Plaintiffs and others in the community;

   c) Failing to properly inspect the plant to assure the equipment, chemicals, and personnel were fit for their intended purposes;

   d) Failing to adequately interview, screen, hire, train, supervise, equip, warn, or manage personnel to ensure the plant is properly and safely operated, and explosions do not occur;

   e) Failing to adequately contain and protect dangerous substances, such that they are adequately protected from explosions, or adequate contingencies are in place to protect others and the environment should explosions occur;

   f) Acting in a careless and negligent manner without due regard for the safety of others;

   g) Failing to comply with applicable OSHA regulations;

   h) Failing to promulgate, implement and enforce rules, processes, safeguards, and regulations pertaining to safe operations that if they had been implemented and enforced, would have averted the explosions, and resulting damages; and

42

**Exhibit C**                                                          APP 304
**DO NOT COPY OR ALTER - This document contains security features.**

i) Other acts of omission and/or commission to be shown after an adequate time for discovery has passed, or at the time of trial.

94. As a direct and/or proximate result of the TPC plant explosions, Plaintiffs and others in the community suffered (and continue to suffer) injury, harm, and damages in the form of, *inter alia*, personal injuries, economic injury, business and income losses, property damages, and other damages and/or losses.

95. The TPC plant explosions resulted in an economic and ecological disaster that directly and/or proximately caused a tortious invasion that interfered with Plaintiffs' and others' interests in their health, properties, businesses, and incomes.

96. Prior to the TPC plant explosions, TPC had actual and/or constructive knowledge of the facts and circumstances causing the explosions. TPC knew, or should have known, its failures to exercise reasonable care would cause significant injury, harm, and damages. TPC's actions and inactions were grossly negligent, reckless, willful, and/or wanton.

97. TPC's above-described wrongful actions, inaction and/or omissions constitute negligence and/or gross negligence under Texas common law—for which Plaintiffs are entitled to compensation.

## COUNT II

### NEGLIGENCE *PER SE*

**(AGAINST DEFENDANT TPC, OWNER DEFENDANTS, AND SAWGRASS HOLDINGS GP LLC[57])**

98. The preceding factual statements and allegations are incorporated by reference.

---

[57] Upon information and belief one or more Owners Defendants and/or Sawgrass Holdings GP, LLC participated and/or otherwise directed or were associated with the acts and/or omissions of TPC and/or Nehlig pled herein. Accordingly, all the allegations pled against TPC and Nehlig herein are also pled against Owners Defendants and Sawgrass Holdings GP. NALCO's, INGENERO's, and Owners' and Sawgrass Holdings GP, LLC's liability is several and independent from that of TPC. Stated differently, NALCO, INGENERO, Owners, and Sawgrass Holdings GP, LLC would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

43

**Exhibit C**                                                                 APP 305

**DO NOT COPY OR ALTER - This document contains security features.**

99.    Under 30 TEX. ADMIN. CODE § 122.146, Title V permit holders—such as TPC—must certify compliance for at least each 12-month period following initial permit issuance and must submit the compliance certification to the executive director of the TCEQ within thirty (30) days of any certification period. The TPC plant's permit compliance certification for the January 1, 2017 through December 31, 2017 certification period was due by January 30, 2018 but was not submitted until July 23, 2018. As such, TPC violated the law by failing to submit a permit compliance certification within thirty days after the end of the certification period in violation of the law.

100.    Under 30 TEX. ADMIN. CODE § 101.201, owners and operators of a regulated entity—such as TPC—experiencing an emissions event must create a final record of all reportable and non-reportable emissions events no later than two weeks after the end of the emissions event, including an estimated total of air contaminants emitted. TPC, however, violated the law by failing to correctly report the estimated total for 1,3-butadiene, VOC, CO, and NOx released during an April 13, 2018 emissions event.

101.    Under 30 TEX. ADMIN. CODE § 111.201, a person—such as TPC—may not cause, suffer, allow, or permit any unauthorized outdoor burning within the State of Texas. No person may cause, suffer, allow, or permit any activity in violation of the TEXAS CLEAN AIR ACT or any TCEQ permit, rule, or order.[58] The 2019 Thanksgiving holiday Port Neches facility explosions and fire were not authorized by the TEXAS CLEAN AIR ACT, TPC's permits, or any TCEQ rule or order. TPC, therefore, also violated the law by causing, suffering, allowing, or permitting outdoor burning at the TPC plant in violation of 30 TEX. ADMIN. CODE § 111.201 and TEX. WATER CODE § 7.101 each day from November 27, 2019, until the burning ceased on January 4, 2020.

---

[58] TEX. WATER CODE § 7.101.

44

CERTIFIED COPY

**Exhibit C**

DO NOT COPY OR ALTER - This document contains security features.

102.    Under 30 TEX. ADMIN. CODE § 101.4, no person—such as TPC—may discharge air contaminants in such concentration and of such duration that are injurious to or adversely affect human health or welfare, animal life, vegetation, or property, or interfere with the normal use and enjoyment of animal life, vegetation, or property. Also, no person may cause, suffer, allow, or permit any activity in violation of the TEXAS CLEAN AIR ACT or any TCEQ permit, rule, or order.[59] Inhalation of 1,3-butadiene can cause irritation of the nose, eyes, mouth, and throat, and exposure in high concentrations can further cause nausea, blurred vision, fatigue, coma, and death. As a direct result of the TPC plant explosions and fires, Jefferson County issued a mandatory evacuation order for residents within a four-mile radius and an order to shelter-in-place for other residents in the area. The evacuation order and shelter-in-place order were lifted on December 5, 2019. As such, TPC also violated the law by causing, suffering, allowing, or permitting a nuisance at the TPC petrochemical facility in violation of 30 TEX. ADMIN. CODE § 101.4 and TEX. WATER CODE § 7.101, from at least November 27, 2019 to December 5, 2019.

103.    Under 30 TEX. ADMIN. CODE § 111.111(a), no person—such as TPC—may cause, suffer, allow, or permit visible emissions from any source unless authorized by the TEXAS CLEAN AIR ACT or TCEQ rule, permit, or order. Also, no person may cause, suffer, allow, or permit any activity in violation of the TEXAS CLEAN AIR ACT or any TCEQ permit, rule, or order.[60] The first explosion at the TPC plant early occurred on November 27, 2019, and created a large, dark emissions plume. The plume was visible miles away from the plant. The visible emissions from the fire were not authorized by the TEXAS CLEAN AIR ACT, TPC's permits, or any TCEQ rule or order. Therefore, TPC also violated the law by causing, suffering, allowing, or permitting

---

[59] TEX. WATER CODE § 7.101.
[60] Id.

CERTIFIED COPY

**Exhibit C**                                                                 APP 307

DO NOT COPY OR ALTER - This document contains security features.

unauthorized visible emissions at the plant in violation of 30 TEX. ADMIN. CODE § 111.111 and TEX. WATER CODE § 7.101, each day from November 27, 2019, until all visible emissions related to the fire ceased on January 4, 2020.

104.    Under section 26.121(a) of the TEXAS WATER CODE, except as authorized by TCEQ, no person—such as TPC—may: (i) discharge municipal, recreational, agricultural, or industrial waste into or adjacent to any water in the State; (ii) discharge other waste into or adjacent to any water in the state which may cause pollution of the water; or (iii) commit any other act or engage in any other activity which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state. To discharge means to deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release or dispose of, or to allow, permit or suffer any of these acts or omissions.[61] Additionally, no person may cause, suffer, allow, or permit any activity in violation of the TEXAS WATER CODE or any TCEQ permit, rule, or order.[62] On November 27, 2019, discharges from firefighting activities involving contaminated water and petrochemicals bypassed the joint wastewater treatment plant and discharged through Outfall 201 into an unnamed ditch, then into Star Lake Canal (Segment 0601A), and then into the Neches River Tidal (Segment 0601), which are waters of the State of Texas. The wastewater discharges from the TPC plant were not authorized by the TEXAS WATER CODE, TPC's permits, or any TCEQ rule or order. In addition, the discharges resulted in a serious impact to the environment, evidenced by a visible sheen and degraded water quality, and impacts to wildlife in Star Lake Canal, including at least 2,196 dead fish and 51 dead crabs. TPC caused, suffered, allowed, or permitted the discharge of wastewater in the waters of the state in violation of TEXAS

---

[61] TEX. WATER CODE § 26.001(20).
[62] TEX. WATER CODE § 7.101.

46

**Exhibit C**

**DO NOT COPY OR ALTER - This document contains security features.**

APP 308

WATER CODE Sections 26.121 and 7.101, from November 27, 2019 until discharges ceased on December 16, 2019.

105. All of TPC's above-referenced statutory violations directly and/or proximately caused (or were the result of) the 2019 Thanksgiving holiday TPC plant explosions, fire, toxic emissions, and concussive shock waves and their aftermath that damaged the property and/or businesses of Plaintiffs and other nearby homeowners and business owners and/or caused Plaintiffs to suffer personal injuries.

106. Plaintiffs are clearly within the class of persons the above-referenced state statutes, programs, rules, and regulations are designed to protect. The injury, harm, and damages Plaintiffs, in fact, have suffered (and will continue to suffer) due to the TPC plant explosions, fires, toxic emissions, and concussive shock waves and their aftermath are precisely the types of injury, harm, and damages the above-referenced state statutes, programs, rules, and regulations are designed to guard against and prevent.

107. By their above-described wrongful actions, inaction, omissions, and the resulting explosions, fires, toxic emissions, concussive shock waves and their aftermath, TPC also failed to comply with its own internal TPC GROUP BUSINESS CONDUCT AND ETHICS CODE ("TPC BCE").[63] Pursuant to the TPC BCE; to wit:

*Protection of the Environment*

Protecting people and the environment is key to the Company's commitment to its values. It is part of every decision and action by the Company.

Each employee and officer of the Company is responsible for ensuring that its products and operations meet applicable government and Company standards, whichever is more stringent. The Company's goal is to eliminate injuries, prevent adverse environmental impact, reduce wastes and emissions, and promote resource conservation at every stage of the life cycle of its products.

The Company expects all employees to be familiar with environmental, health and safety laws, and Company policies applicable to their area of business. The laws are complex, subject to frequent changes and vary from country to country. Seek

---

[63] *See* TPC Group, *BUSINESS CONDUCT AND ETHICS CODE (BCE)* (revised April 2, 2018), https://tpcgroup-files.nyc3.Digitaloceanspaces.com/Files/TPC-Group-Business-Conduct-and-Ethics-Code.pdf (last visited Sept. 21, 2020).

47

advice from the Legal Department or the Environmental, Health, Safety, and Security (EHSS) group to clarify how these laws apply to your job.

*Workplace Health and Safety*

The Company's health and safety rules and procedures are designed to provide a safe and healthy work environment and meet or exceed applicable laws. Maintaining a safe and healthy work environment is heavily dependent on the choices and behavior of the Company's employees and other individuals.
Each employee must be aware of the rules and procedures that apply to his or her workplace, diligently follow the rules and encourage others to do the same. Immediately report any unsafe situations or acts to your supervisor, Human Resources, or the site EHSS leader.[64]

108.    Plaintiffs also are clearly within the class of persons the TPC BCE is designed to protect. The injury, harm, and damages they, in fact, have suffered (and will continue to suffer) due to the TPC plant explosions, fires, toxic emissions, concussive shock waves and their aftermath are precisely the types of injury, harm, and damages the TPC BCE is designed to guard against and prevent.

109.    As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and violations of the above-referenced state statutes, programs, rules, and regulations, and the TPC BCE, Plaintiffs have suffered (and will continue to suffer) injury, harm, and damages to their property, businesses, and themselves. TPC's above-described wrongful actions, inaction, omissions, and the resulting plant explosions, fires, toxic emissions, and concussive shock waves and their aftermath constitute negligence *per se* at Texas common law— for which Plaintiffs are entitled to compensation.

## COUNT III

## NEGLIGENCE/GROSS NEGLIGENCE

### (AGAINST DEFENDANT JOSHUA NEHLIG)

110.    The preceding factual statements and allegations are incorporated by reference.

---

[64] *See* TPC Group, *BUSINESS CONDUCT AND ETHICS CODE (BCE)* (revised April 2, 2018), https://tpcgroup-files.nyc3.Digitaloceanspaces.com/Files/TPC-Group-Business-Conduct-and-Ethics-Code.pdf (last visited Sept. 21, 2020).

48

**Exhibit C**                                                            APP 310

DO NOT COPY OR ALTER - This document contains security features.

111. The TPC Port Neches, Texas plant manager, JOSHUA NEHLIG, had a non-delegable duty to maintain a safe plant and failed in that aspect. Among other things, JOSHUA NEHLIG was negligent in failing to ensure safety measures designed to prevent such explosions were properly implemented at the plant. Furthermore, JOSHUA NEHLIG failed to lead a safe working environment and took short cuts when it came to safety and/or failed to act to ensure the plant was operating safely. His lack of leadership related to safety lead to the conditions that made the explosions inevitable. JOSHUA NEHLIG failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures, monitors, personnel, equipment, inspections, and resources were readily available to prevent and/or mitigate the effects of an uncontrolled explosion, and thereby breached, *inter alia*, the following duties owed to Plaintiffs:

a. Failing to properly supervise personnel;

b. Failing to properly inspect, maintain, monitor, staff, and examine equipment used in the plant;

c. Failing to adequately interview, hire, train, instruct, and/or supervise employees, third parties, and others who worked in and around the plant;

d. Failing to implement adequate safety protocols, inspections, monitors, processes, and routines to ensure the plant personnel and equipment were good and safe working conditions;

e. Failing to adequately warn about the dangers existing in the plant including, but not limited to, explosions, chemical releases, contamination, and pollution; and

f. Other acts of omission and/or commission, to be specified after an adequate time for discovery or at trial.

112. JOSHUA NEHLIG's above-described wrongful actions, inaction and/or omissions constitute negligence and/or gross negligence under Texas common law—for which Plaintiffs are entitled to compensation.

## COUNT IV
## NEGLIGENCE, GROSS NEGLIGENCE, AND INTENTIONAL TRESPASS
### (AGAINST ALL DEFENDANTS[65])

113. The preceding factual statements and allegations are incorporated by reference.

---

[65] As to Plaintiffs' cause of action for intentional trespass, and only intentional trespass, such cause of action **is not** asserted against the following Defendants: First Reserve Corporation, L.L.C., FR Sawgrass, L.P., First Reserve Management, L.P., FR XII Alpha AIV, L.P., FR XII-A Alpha AIV, L.P., Sawgrass Holdings, L.P., SK Sawgrass, LP, and SK Second Reserve, L.P. f/k/a SK Capital Partners, L.P.

49

Exhibit C

APP 311

DO NOT COPY OR ALTER - This document contains security features.

114. As described previously, Defendants negligently caused large explosions adversely affecting Plaintiffs, their property, and their health, as well as that of many surrounding citizens.

115. Defendant's negligence and trespass caused injury to Plaintiffs' health, their property, and the health and properties of others

116. As discussed previously, Plaintiffs' injuries and damages resulted from Defendant's negligent, grossly negligent, and/or intentional trespass, which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003(a).

117. Plaintiffs are entitled to a judgment finding Defendants liable to Plaintiffs for damages suffered as a result of Defendant's negligent, grossly negligent and/or intentional trespass and awarding Plaintiffs adequate compensation in an amount to be determined by the trier of fact, including exemplary damages for Defendant's conduct.

**COUNT V**

**<u>NEGLIGENCE AND/OR GROSS NEGLIGENCE</u>**

**(AGAINST ALL DEFENDANTS)**

118. The preceding factual statements and allegations are incorporated by reference.

119. As described previously, Defendants negligently caused large explosions adversely effecting Plaintiffs, their property, and their health, as well as that of many surrounding citizens.

120. Defendant's negligence caused injury to Plaintiffs' health, their property, and the health and properties of others.

121. As discussed previously, Plaintiffs' injuries and damages resulted from Defendant's negligence and/or grossly negligent conduct, which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003(a).

122. Plaintiffs are entitled to a judgment finding Defendants liable to Plaintiffs for damages suffered as a result of Defendant's negligence and/or grossly negligent conduct and awarding

50

**Exhibit C**                                                                                          APP 312

**<u>DO NOT COPY OR ALTER - This document contains security features.</u>**

Plaintiffs adequate compensation in an amount to be determined by the trier of fact, including exemplary damages for Defendant's conduct.

## COUNT VI
## NUISANCE
## (AGAINST ALL DEFENDANTS)

123.    The preceding factual statements and allegations are incorporated by reference.

124.    Under Texas law, a private nuisance is

> a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it.[66]

125.    Under Texas law, there also "must be some level of culpability on behalf of the defendant; nuisance cannot be premised on a mere accidental interference."[67] The following three general categories of conduct support liability for creating a private nuisance:

> **Intentional nuisance.** A defendant who acts with the desire to create an interference or with knowledge that the interference is substantially certain to result is liable for intentionally causing the interference even if the defendant does not agree that the interference is substantial or that the effects on the plaintiffs are unreasonable.

> **Negligent nuisance.** A negligent nuisance claim is governed by ordinary negligence principles, meaning a plaintiff only needs to prove duty, breach, and damages caused by that breach.

> **Strict liability nuisance.** A strict liability claim must be based on conduct that constitutes an "abnormally dangerous activity" or involves an "abnormally dangerous substance" that creates a "high degree of risk" of serious injury, but not an activity that is "abnormal and out of place in its surroundings."[68]

126.    By their above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves that extended far beyond plant premises, and their aftermath, Defendants substantially interfered with Plaintiffs' use and

---

[66] *Crosstex North Texas Pipeline, L.P. n/k/a Enlink North Texas Pipeline LP v. Gardiner*, 505 S.W.3d 580 (Tex. 2016), *reh'g denied* (Dec. 16, 2016).
[67] *Id.*
[68] *Id.*

Exhibit C

DO NOT COPY OR ALTER - This document contains security features.

enjoyment of their real property and businesses by causing unreasonable discomfort and/or annoyance to their ordinary sensibilities when attempting to use and enjoy their real property and businesses the day before Thanksgiving and thereafter to this day—thereby directly and/or proximately causing Plaintiffs to suffer the above-described injury, harm and damages to their property, businesses, and themselves. Defendant's above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves that extended far beyond plant premises, and their aftermath, constitute an intentional, negligent, and/or strict liability private nuisance at Texas common law—for which Plaintiffs are entitled to compensation.

127.    Defendant's above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves that extended far beyond plant premises, and their aftermath, also interfered with the interests of the surrounding community, interfered with public health and safety, and directly and/or proximately damaged the general public in the form of toxic emissions released during the explosions and fires that also extended far beyond the TPC petrochemical plant's premises. Defendant's above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves and their aftermath constitute a public nuisance at Texas common law—for which Plaintiffs are entitled to compensation.

## COUNT VII
## NEGLIGENCE, MISREPRESENTATIONS, FRAUD, AND VEIL PIERCING
### (AGAINST OWNER DEFENDANTS AND SAWGRASS HOLDINGS GP LLC[69])

128.    The preceding factual statements and allegations are incorporated by reference.

129.    Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC undertook direct operational control of the TPC plant in Port Neches and assumed the duty

---

[69] As to Plaintiffs' causes of action for misrepresentations and fraud, and only misrepresentations and fraud, such causes of action **are not** asserted against the following Defendants: First Reserve Corporation, L.L.C, FR Sawgrass, L.P., First Reserve Management, L.P., FR XII Alpha AIV, L.P., FR XII-A Alpha AIV, L.P., Sawgrass Holdings, L.P., SK Sawgrass, LP, SK Second Reserve, L.P. f/k/a SK Capital Partners, L.P, and Sawgrass Holdings GP, LLC.

52

**Exhibit C**                    APP 314
**DO NOT COPY OR ALTER - This document contains security features.**

of risk mitigation as well as other duties outlined in this *Petition*. Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, failed to adequately control the operations at the TPC plant in Port Neches, failed to adequately mitigate against the risk of plant failure, and committed other acts and/or omissions related to TPC's Port Neches plant that affected its turnarounds, shutdowns, maintenance, repairs, upkeep, training, personnel, supervision, safety, and overall operations injuring, damaging, and/or impacting Plaintiffs and others.

130. Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC were negligent in their undertaking to provide operational improvement and risk mitigation for TPC. TPC's Port Neches plant made requests to Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC for necessary capital improvements including, *inter alia*, an operable fire water supply valve, which were denied and/or delayed by Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC. TPC did not and could not achieve *"operational excellence"* or properly mitigate risks prior to the explosions and chemical release(s) because Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC demanded TPC increase production all the while *crucially* denying funds to adequately supply the plant with spare parts, such as pumps, or perform necessary turnarounds and maintenance needed to keep the plant safe. Owners', including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's negligent acts were carried out through its employees, agents, and/or managers who were acting in the course and scope of their employment with Defendants.

131. At all relevant times, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC owned, operated, directed, controlled, conducted, and participated in the business and financial affairs of TPC and the TPC petrochemical plant (the enterprise or

53

Exhibit C APP 315
DO NOT COPY OR ALTER - This document contains security features.

enterprises) (and continue to do so). By way of example, the following Defendant SK Capital managing directors also were (or are) on TPC's Board of Directors (as well as the boards of other Defendant SK Capital-owned companies):

(i)      Barry Siadat, Co-Founder and Managing Director of Defendant SK, and former Director of the TPC Defendants.[70]
(ii)     Jack Norris, Managing Director of Defendant SK, and current Director of the TPC Defendants.[71] Jack Norris also serves on the boards of directors of several other SK-owned petrochemical companies based in Texas.

132.    Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC and their officers and directors were direct participants in TPC's wrongful conduct described above and as such are directly and personally liable for the above-described wrongful acts.

133.    Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, exercised control over TPC through the Board of Managers of Sawgrass Holdings GP LLC (the "Board"). The Board consisted of two members each from Defendants First Reserve and SK Capital, and one from TPC.

134.    Additionally, and/or in the alternative, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC and their officers and directors voluntarily undertook to take control over safety with respect to the safeguards, protocols, procedures, personnel, equipment, inspections, and resources that were readily available to prevent and/or mitigate the effects of uncontrolled explosions. Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC recognized or should have recognized that performing these services was necessary for the protection of third persons and their property. In so doing, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC voluntarily assumed a duty to TPC employees and to the public because (1) Owners',

---

[70] Team, *Barry Siadat*, SKCAPITALPARTNERS.COM, https://skcapitalpartners.com/team/barry-siadat/ (last visited April 22, 2021).
[71] Team, *Jack Norris*, SKCAPITALPARTNERS.COM, https://skcapitalpartners.com/team/jack-norris/ (last visited April 22, 2021).

54

**Exhibit C**                    APP 316
DO NOT COPY OR ALTER - This document contains security features.

including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's failure to exercise reasonable care increased the risk of harm to TPC employees and the public, and (2) through their usurpation of control over these functions, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC undertook to perform duties owed by TPC to TPC employees and the public. By taking control over these functions, Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC took control away from TPC and supplanted TPC's duties to its employees and the public with respect to the specific safety decisions that led to the explosion and the harms that followed. Such amounts to negligence under Restatement (Second) of Torts § 324a.

135. Additionally, and/or in the alternative, Owners, including but not limited to Sawgrass Holdings, LP and Sawgrass Holdings GP LLC are the ultimate parent corporations of TPC. Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC and their officers and directors also control, manage, operate, and treat TPC and the TPC petrochemical plant as their personal bank accounts in such a way that TPC and the TPC petrochemical plant are Owners', including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's alter egos in that corporate formalities are not followed, TPC and the TPC petrochemical plant are undercapitalized, and the lines between parent and subsidiary are substantially blurred to the point that it is difficult—if not impossible—to determine where Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC end and TPC and the TPC petrochemical plants begin.

136. At all relevant times, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, working together, utilizing the mails and interstate wires and mails, engaged in the above-referenced unlawful and intentional schemes to defraud and pattern of unlawful activity involving intentional misrepresentations, non-disclosures (when they had a duty to speak), cheating, wrongful actions, inaction, and/or omissions (on which Plaintiffs and state

55

**Exhibit C**

**DO NOT COPY OR ALTER - This document contains security features.**

government oversight agencies justifiably relied) that directly and/or proximately caused Plaintiffs to suffer damages to their businesses, property, and themselves; to wit, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, *inter alia*, (i) breached their duty to use reasonable care by imposing their business strategies on TPC and the TPC petrochemical plant by, *inter alia*, (a) requiring TPC to cut critical operating costs and other measures at, and, in fact, undercapitalizing, the TPC petrochemical plant, including expenses for maintenance, repairs, upkeep, personnel, training, supervision and safety, (b) requiring TPC to limit capital investments at the TPC petrochemical plant, thereby preventing TPC from adequately engaging in training, maintenance, supervision, safety, and constructing, enhancing, and/or maintaining critical infrastructure at the TPC petrochemical plant, and/or (c) failing to adequately evaluate the safety and training procedures in place at the TPC petrochemical plant at the time of the explosions; (ii) positioning TPC and the TPC petrochemical plant as a low cost manufacturing operation by decreasing capital spending to minimum sustainable (and unsafe) levels; (iii) actively and directly mandating unreasonable cuts in the TPC petrochemical plant's budget in order to carry out its fraudulent and irresponsible business strategy; and (iv) actively and directly participating in creating conditions within the TPC petrochemical plant that directly and/or proximately caused the November 27, 2019 explosions and fires; and (v) misrepresenting (either affirmatively or via non-disclosure when they had a duty to speak) to the EPA, TCEQ, OSHA (and possibly other government oversight agencies), and the surrounding communities (including Plaintiffs) that the TPC petrochemical plant was safe and in full compliance with the CLEAN AIR ACT, CLEAN WATER ACT, SAFE DRINKING WATER ACT, HAZARDOUS WASTE RESOURCE CONSERVATION AND RECOVERY ACT, and other applicable laws and regulations. At all relevant times, Owners mandated and imposed an overall business and budgetary strategy on TPC and the TPC petrochemical plant

56

and carried out such strategy by their own specific direction, authorization, control, and participation far surpassing the level of control typically exercised as a normal incident of corporate ownership in disregard of the interests of TPC, the TPC petrochemical plant, and Plaintiffs. Owners', including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's liability is several and independent from that of TPC. Stated differently, the Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

137.     Additionally, and/or in the alternative, upon information and belief, the Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC, through the Board of Managers of Sawgrass Holdings GP LLC changed the way it calculated EBITDA so as to exclude turnaround and catalyst amortization and repeatedly delayed the turnaround required to address the popcorn polymerization issues in order to produce a deceptive and inflated picture of TPC Group's profitability to make the company appear more attractive to prospective buyers. This intent to defraud provides an additional ground for piercing the corporate veil.

138.     Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC engaged in the above-described unlawful and intentional schemes to defraud involving misrepresentations, non-disclosures (when they had a duty to speak), cheating, wrongful actions, inaction, and/or omissions for the purposes of maximizing their cash flow, revenue, and profits siphoned out of TPC and the TPC petrochemical plant, and maximizing their overall return on investment in TPC and the TPC petrochemical plant. Owners including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC did so for their financial benefit to the detriment of Plaintiffs' rights and interests.

57

**Exhibit C**                                                                 APP 319
DO NOT COPY OR ALTER - This document contains security features.

139.  All of the foregoing acts and/or omissions by Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC were a producing and/or proximate cause of the injuries or damages of Plaintiffs.

## COUNT VIII

## GROSS NEGLIGENCE

## (AGAINST OWNER DEFENDANTS AND SAWGRASS HOLDINGS GP)

140.  The preceding factual statements and allegations are incorporated by reference.

141.  Plaintiffs' injuries and damages resulted from Owners', including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's gross negligence which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003(a).

142.  Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC owed and breached duties of ordinary and reasonable care to Plaintiffs and others in the community in connection with the maintenance of, and operation of the TPC plant in Port Neches, and additionally owed (and breached) duties to Plaintiffs and others to guard against and/or prevent the risk of the explosions.

143.  Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC breached, *inter alia,* their duties to provide risk mitigation and failed to exercise reasonable care, acting with reckless, willful, and wanton disregard in the negligent maintenance and/or operation of the TPC plant in Port Neches.

144.  Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous explosion (or two) or significant environmental, health, and property damage, causing damage to those affected by the explosion(s) by failing to exercise reasonable care and acting with reckless, willful, and wanton disregard in the operation of the plant.

145.  Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs. Owners', including but not limited to

58

**Exhibit C**                    APP 320
**DO NOT COPY OR ALTER - This document contains security features.**

Sawgrass Holdings LP and Sawgrass Holdings GP LLC's liability is several and independent from that of TPC. Stated differently, Owners including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

146.    Plaintiffs are entitled to a judgment finding Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC liable to Plaintiffs for damages suffered as a result of Defendants SK Capital's and First Reserve's gross negligence and/or willful misconduct and awarding Plaintiffs adequate compensation in an amount to be determined by the trier of fact, including exemplary damages for Owners', including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC's conduct.

147.    All of the foregoing acts and/or omissions by Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC were a producing and/or proximate cause of the injuries or damages of Plaintiffs.

## COUNT IX
## DISREGARD OF THE CORPORATE IDENTITIES
### (AGAINST OWNERS and SAWGRASS HOLDINGS GP LLC)

148.    The preceding factual statements and allegations are incorporated by reference.

149.    Where, as here, there is such unity between the corporation—TPC—and the shareholders—Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings, GP LLC—that the separateness of the corporation has ceased and the shareholders improper uses of the corporation—TPC—that the shareholders—Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings, GP LLC—have damaged the community estate, the corporate identity should be disregarded.

150.    Specifically, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings, GP LLC ("shareholders"), maintain such a high degree of financial interest, ownership, and control over TPC that shareholders and TPC are one in the same. Indeed, upon information

59

and belief, Peggy Macatangay informs Plaintiffs that there is no board of directors for TPC LLC or TPC Inc.; rather, it is really Sawgrass, which is owned by funds that are sponsored by First Reserve and SK Capital, which governs TPC LLC and TPC Inc.

151.    Further, shareholders' financial interest is exceeded only by the degree of control shareholders exercise over TPC. Peggy Macatangay informs Plaintiffs that TPC requests approval from shareholders to conduct its affairs – such approval requests include but are not limited to any expenditure of more than $1,000,000 and turnaround approval and authority in excess of $5,000,000.00.

152.    In addition to, and/or in the alternative, the distinct corporate identity of the corporation—TPC—may be disregarded even if the corporate formalities have been observed and even if corporate assets have been kept separate from individual property if any one or more of the following has occurred and if recognizing the distinct corporate identity will damage the community, Port Neches, Texas and her surrounding environ:

(1)    The corporate form has been resorted to as a means of evading an existing legal obligation; or
(2)    The corporate form has been relied on as a protection of crime **or to justify wrong.**

153.    But for want of approval for a turnaround, a necessity to ameliorate the endemic viral infection of popcorn polymerization within TPC Port Neches, the explosions and subsequent plumes of toxic air which accompanied same, would not have occurred and Plaintiffs and others would not have suffered the devastation so suffered nor would Plaintiffs and others have suffered similar unwelcome injuries and disruption to their daily lifestyles. To continue to regard TPC as an entity separate and apart from Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC would be to the detriment, injury, and damage to Plaintiffs and their community.

154.    Upon further information and belief, Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC ("shareholders") have resorted to and rely upon the existence of Sawgrass Holdings LP and Sawgrass Holdings GP LLC and TPC to avoid the imposition of liability and to insulate shareholders from the very acts perpetuated by shareholders

60

**Exhibit C**                                                                              APP 322
DO NOT COPY OR ALTER - This document contains security features.

and to escape the imposition of certain other legal duties, obligations, and the like for which they should be held liable.

155.    In addition to and/or in the alternative, upon further information and belief, shareholders and Owners rely upon Sawgrass Holdings LP and Sawgrass Holdings GP LLC and TPC to justify a wrong – to wit the numerous wrongs made the basis of causes of action found elsewhere and throughout this Petition. Put simply, shareholders and owners depend upon Sawgrass Holdings LP and Sawgrass Holdings GP LLC and TPC to escape the imposition of liability.

156.    For these and other reasons to be gleaned from trial on the merits or through ongoing discovery, the corporate fiction of TPC and Owners, including but not limited to Sawgrass Holdings LP and Sawgrass Holdings GP LLC should be disregarded *en toto*.

**COUNT X**

**<u>NEGLIGENCE/GROSS NEGLIGENCE</u>**

**(AGAINST DEFENDANTS NALCO[72] & SUEZ[73])**

157.    The preceding factual statements and allegations are incorporated by reference.

158.    At all relevant times, SUEZ and NALCO were under a duty to utilize reasonable care in the work done at TPC's Port Neches plant.

159.    SUEZ and NALCO's plant obligations and conduct obligated them to protect Plaintiffs, who were within the appreciable zone of risk created by SUEZ and NALCO's activities and would foreseeably be exposed to harm due to those risks.

160.    During its time as TPC's chemical vendor, SUEZ knew of should have known it was performing its work inadequately and in a way that initiated a rapid increase in the production of popcorn polymer at TPC's Port Neches facility. This included S4D4 A&B towers which were so overwhelmingly infected with active popcorn seeds that the only way to ensure the towers could

---

[72] The Certificate of Merit of Victor Edwards, P.E. dated April 22, 2021 is attached hereto as Ex.1 and incorporated by reference herein as if fully set forth herein. Plaintiffs rely on this in support of their claims against NALCO as required by TEX. CIV. PRAC. & REM CODE §150.002.

[73] The Certificate of Merit of Victor Edwards, P.E. dated November 21, 2021 is attached hereto as Ex.2 and incorporated by reference herein as if fully set forth herein. Plaintiffs rely on this in support of their claims against SUEZ as required by TEX. CIV. PRAC. & REM CODE §150.002.

61

continue to perform safely was to shut them down, clean them out, and passivate them. Instead of recommending to TPC that the S4D4 A&B towers be immediately shutdown, cleaned, and passivated, SUEZ continued to provide and charge TPC for process chemistry treatment it knew, or should have known, would be ineffective.

161.     By the summer of 2019, NALCO knew, or should have known, that the finishing section of TPC's Port Neches facility, including S4D4 A&B towers, was so overwhelmingly infected with active popcorn seeds that the only way to ensure the towers could continue to perform safely was to shut them down, clean them out, and passivate them. Instead of recommending to TPC that the S4D4 A&B towers be immediately shutdown, cleaned, and passivated, NALCO continued to provide and charge TPC for process chemistry treatment it knew, or should have known, would be ineffective.

162.     SUEZ and NALCO were under a duty of care to refrain from negligent conduct that would cause popcorn polymer issues, explosions, toxic emissions, and/or concussive shock waves resulting in injuries, damages, contamination, and/or pollution of the nearby residents, their property, and others including, but not limited to, Plaintiffs.

163.     SUEZ and NALCO was under a duty to exercise reasonable care while conducting its work at TPC's Port Neches plant, including, *inter alia*, its work/personnel/equipment/ procedures/protocols/maintenance/testing/consulting/advice related to TPC's Port Neches plant.

164.     SUEZ and NALCO knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs, Plaintiffs' children, Plaintiffs' property, nearby residents' health and property, businesses, the land, the water, the environment, and others.

165.     SUEZ and NALCO failed to exercise reasonable care while actively participating in the TPC Port Neches plant operations, thereby breaching the duties it owed to Plaintiffs and others in the community. NALCO's, Ingenero's, Owners' and Sawgrass Holdings GP's liability is several and independent from that of TPC. Stated differently, NALCO, Ingenero, Owners, and Sawgrass GP would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they

62

**Exhibit C**                                                                                      APP 324
**DO NOT COPY OR ALTER - This document contains security features.**

were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

166.    SUEZ and NALCO also failed to exercise reasonable care related to the TPC Port Neches plant operations to ensure that the popcorn polymer issues and/or explosions and emissions did not occur, thereby further breaching the duties it owed to Plaintiffs and others in the community.

167.    SUEZ and NALCO failed to provide adequate service, advice, communication, consulting, safeguards, protocols, procedures, personnel (including competent, qualified personnel), equipment, inspections, and resources to prevent and/or mitigate the effects of popcorn polymer and/or uncontrolled explosions, thereby further breaching the duties it owed to Plaintiffs and others in the community.

168.    As set forth above, SUEZ and NALCO failed to perform their undertaking as a reasonably prudent chemical treatment vendor would perform services, the failure to vet, train, screen, supervise and/or staff to adequately handle and/or monitor the popcorn polymer and other issues at the TPC Port Neches plant. SUEZ's and NALCO's negligence was the direct and/or proximate cause of the explosions and releases at TPC's Port Neches facility on November 27, 2019.

169.    Plaintiffs' injuries and damages resulted from SUEZ and NALCO's gross negligence, which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003(a).

170.    SUEZ and NALCO owed and breached duties of ordinary and reasonable care to Plaintiffs and others in the community in connection with the maintenance, consultation, and operation of the plant, and additionally owed and breached duties including, *inter alia*, breaching their duty to provide adequate and/or reasonable advice, consultation, recommendations, monitoring, staffing, and work related to TPC's Port Neches plant operations.

171.    SUEZ and NALCO also breached their duty to Plaintiffs and failed to exercise reasonable care, acting with reckless, willful, and wanton disregard in the negligent conduct, consulting, service, advice, maintenance and/or operation of the TPC Port Neches plant. NALCO and SUEZ's, liability is several and independent from that of TPC. Stated differently, NALCO and SUEZ would

63

be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

172.    SUEZ and NALCO also knew, or should have known, that their above-described wanton, willful, and reckless misconduct, and failure to exercise reasonable care would result in a disastrous explosion (or two) and significant environmental, health, and property damage.

173.    SUEZ and NALCO acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs.

174.    By its above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves, and their aftermath that extended far beyond plant premises and invaded Plaintiffs' properties, SUEZ and NALCO directly and/or proximately caused Plaintiffs to suffer (and continue to suffer) the above-described injury, harm and damages to their property, businesses, and themselves. SUEZ and NALCO's above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves, and their aftermath constitute negligence and/or gross negligence at Texas common law—for which Plaintiffs are entitled to compensation and exemplary damages in an amount to be determined by the trier of fact.

## COUNT XI
## NEGLIGENCE/GROSS NEGLIGENCE
### (AGAINST DEFENDANT INGENERO[74])

175.    The preceding factual statements and allegations are incorporated by reference.

176.    During the relevant time period set forth herein, TPC hired Ingenero to provide engineering services and partner with them to oversee the butadiene production at the Port Neches plant. Ingenero agreed to make its own observations and recommendations concerning the plant's

---

[74] The Certificate of Merit of Victor Edwards, P.E. dated April 22, 2021 is attached hereto as Ex.1 and incorporated by reference herein as if fully set forth herein. Plaintiffs rely on this in support of their claims against INGENERO as required by TEX. CIV. PRAC. & REM CODE §150.002.

64

process operations and chemistry. In its work, Ingenero reviewed daily operator logs, process operations, and process chemistry data.

177.  Based upon its review and exercising its engineering judgement, Ingenero reported its daily observations and made recommendations it determined necessary for the safe and efficient operation of TPC's Port Neches plant. Like NALCO, Ingenero knew, or should have known, that the finishing section of TPC's Port Neches facility, including the S4D4 A&B towers, was so badly infected with active popcorn seeds that the only way to ensure the towers could continue to perform safely was to *shut them down*, clean them out, and passivate them. Instead of recommending to TPC that the S4D4 A&B towers be immediately shutdown, cleaned, and passivated, however, Ingenero continued to provide and charge TPC for engineering services it knew or should have known would be ineffective.

178.  While Ingenero knew, or should have known, that there was an active popcorn polymer infection in the TPC plant's butadiene finishing section at that time, Ingenero also knew, or should have known, that TPC did not understand or appreciate this fact. Instead of informing TPC of the active popcorn infection and recommending an immediate shutdown, Ingenero allowed TPC to make decisions based on inaccurate and/or incomplete information. Ingenero knew, or should have known, TPC was relying on Ingenero to make sure TPC had accurate knowledge regarding its plant's process operations and chemistry.

179.  At all relevant times, Ingenero was under a duty to utilize reasonable care in the work done at TPC's Port Neches plant.

180.  Ingenero's plant obligations and conduct obligated it to protect Plaintiffs, who were within the appreciable zone of risk created by Ingenero's activities and would foreseeably be exposed to harm due to those risks.

181.  Ingenero was under a duty of care to refrain from negligent conduct that would cause popcorn polymer issues and/or explosions and emissions resulting in injuries, damages, contamination, and/or pollution of the nearby residents, their property, and others including, but not limited to, Plaintiffs.

65

**Exhibit C**                                                                      APP 327
DO NOT COPY OR ALTER - This document contains security features.

182.    Ingenero was under a duty to exercise reasonable care while conducting its work at TPC's Port Neches plant, including, *inter alia*, its work/personnel/equipment/procedures/ protocols/maintenance/testing/consulting/advice related to the plant.

183.    Ingenero knew, or should have known, that the acts and omissions described herein could result in damage to Plaintiffs, Plaintiffs' children, Plaintiffs' property, nearby residents' health and property, businesses, the land, the water, the environment, and others.

184.    Ingenero failed to exercise reasonable care while conducting its TPC Port Neches plant operations, thereby breaching the duties it owed to Plaintiffs and others in the community, including the failure to vet, train, screen, supervise and/or staff to adequately handle and/or monitor the popcorn polymer and other issues at the Port Neches plant. Ingenero's negligence was the direct and/or proximate cause of the explosions and releases at TPC's Port Neches facility on November 27, 2019.

185.    Ingenero also failed to provide adequate service, advice, consulting, safeguards, protocols, communication, procedures, personnel, equipment, inspections, engineering services, and resources to prevent and/or mitigate the effects of popcorn polymer and/or uncontrolled explosions, thereby further breaching the duties it owed to Plaintiffs and others in the community.

186.    Ingenero further failed to perform its undertaking as a reasonably prudent chemical engineer and/or vendor would perform services as demonstrated by the aforementioned, and other, failures.

187.    Ingenero's negligence was committed by employees and agents of Ingenero and resulted in a hazardous condition(s) that directly and/or proximately Plaintiffs' injuries, damages, and harm.

188.    Plaintiffs' injuries and damages resulted from Defendant Ingenero's gross negligence, which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003(a).

189.    Ingenero owed and breached duties of ordinary and reasonable care to Plaintiffs and others in the community in connection with the maintenance of, consultation, advice upon, and operation

66

Exhibit C                                                    APP 328
DO NOT COPY OR ALTER - This document contains security features.

of the TPC Port Neches plant, and additionally owed and breached duties to Plaintiffs and others to guard against and/or prevent the risk of the explosion.

190.    Ingenero also breached its legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent maintenance and/or operation and/or consulting and/or advice related to the TPC Port Neches plant.

191.    Ingenero knew, or should have known, that its above-described wanton, willful, and reckless misconduct, and failure to exercise reasonable care would result in a disastrous explosion (or two) and significant environmental, health, and property damage.

192.    Ingenero acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs. NALCO's, Ingenero's, Owners' and Sawgrass Holdings GP's liability is several and independent from that of TPC. Stated differently, NALCO, Ingenero, Owners, and Sawgrass Holdings GP would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.

193.    By its above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves, and their aftermath that extended far beyond plant premises and invaded Plaintiffs' properties, Ingenero directly and/or proximately caused Plaintiffs to suffer (and continue to suffer) the above-described injury, harm and damages to their property, businesses, and themselves. Ingenero's above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves, and their aftermath constitute negligence and/or gross negligence at Texas common law—for which Plaintiffs are entitled to compensation and exemplary damages in an amount to be determined by the trier of fact.

67

Exhibit C

APP 329

DO NOT COPY OR ALTER - This document contains security features.

# COUNT XII

## NEGLIGENT MISREPRESENTATION AND FAILURE TO WARN

### (AGAINST ALL DEFENDANTS[75])

194.    The preceding factual statements and allegations are incorporated by reference.

195.    Defendants gave misleading information about the TPC plant explosions and their aftermath to Plaintiffs and the general public and/or withheld material information about the TPC plant explosions and their aftermath from Plaintiffs and the general public and failed to exercise reasonable care when doing so. Plaintiffs justifiably and detrimentally relied on the information provided by Defendants and/or Defendants' silence when they had a duty to speak.

196.    Defendants also failed to warn Plaintiffs and the general public of a developing danger known to Defendants yet concealed from the public and authorities, including, without limitation, the growing popcorn polymer within the TPC plant that created a significant risk of explosion and release of toxic chemicals and the continued release of toxic chemicals into the community without adequate warning to the community.

197.    Defendants' above-referenced wrongful actions, inaction, omissions, misleading statements, and/or silence when they had a duty to speak constitute negligent misrepresentation at Texas common law—for which Plaintiffs are entitled to compensation.

### TEXAS CIVIL PRACTICES AND REMEDIES CODE SECTION 150.002
### "CERTIFICATE OF MERIT" REQUIREMENT SATISFIED

198.    Pursuant to TEXAS CIVIL PRACTICES & REMEDIES CODE SECTION 150.002, injured and/or damaged litigants suing certain "licensed professionals" must, at significant expense and usually before any discovery has been had from those "professionals," file a "certificate of merit" for

---

[75] As to Plaintiffs' causes of action for negligent misrepresentation and failure to warn, and only negligent misrepresentation and failure to warn, such causes of action **are not** asserted against the following Defendants: First Reserve Corporation, L.L.C, FR Sawgrass, L.P., First Reserve Management, L.P., FR XII Alpha AIV, L.P., FR XII-A Alpha AIV, L.P., Sawgrass Holdings, L.P., SK Sawgrass, LP, and SK Second Reserve, L.P. f/k/a SK Capital Partners, L.P. As to Plaintiffs' causes of action for negligent misrepresentation, and only negligent misrepresentation, such cause of action **is not** asserted against Defendant Sawgrass Holdings GP, LLC.

68

certain defendants "[i]n any action or arbitration proceeding for damages arising out of the provision of professional services by a licensed or registered professional…"[76] Without admitting that NALCO, INGENERO and/or SUEZ qualify as a "licensed or registered professional" requiring such a "certificate of merit," out of an abundance of caution, attached as *Exhibit 1* and *Exhibit 2* dated April 22, 2021 and November 21, 2021 respectively are the "certificates of merit" by a "licensed professional engineer" (Mr. Edwards, along with the engineer's (his) curriculum vitae) who "set[s] forth specifically for each theory of recovery for which damages are sought, the negligence, if any, or other action, error, or omission of the licensed or registered professional in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist and the factual basis for each such claim."[77] These certificates of merit, curriculum vitae, and list of material reviewed for each are collectively attached as *Exhibit 1* , and *Exhibit 2* are fully incorporated herein by reference and are being served upon Defendants.

## RELIEF REQUESTED

199.     The preceding factual statements and allegations are incorporated by reference.

200.     **ACTUAL DAMAGES, CONSEQUENTIAL DAMAGES, AND COMPENSATORY DAMAGES.** As a direct and/or proximate result of Defendants' above-referenced wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves and their aftermath, Plaintiffs have suffered (and continue to suffer) injury, harm, and damages to their businesses, property, and themselves in the form of, *inter alia*, (i) personal injury damages from exposure to chemicals and/or petrochemicals released in the explosions, fires, and afterwards, including, without limitation, pain and suffering, mental anguish, physical impairment

---

[76] TEX. CIV. PRAC. & REM. CODE § 150.02(a).
[77] TEX. CIV. PRAC. & REM. CODE § 150.02(b).

Exhibit C                                                                                                    APP 331
DO NOT COPY OR ALTER - This document contains security features.

and disfigurement, past and future medical expenses, (ii) physical damages to their houses, businesses, other structures, and personal property, including cleaning expenses and the loss of use of such property, (iii) real property stigma damages, (iv) lost profits from their businesses, and (v) out-of-pocket evacuation expenses—for which they are entitled to compensation. All injury, harm, and damages suffered (and to be suffered) by Plaintiffs were reasonably foreseeable by Defendants. All conditions precedent to Plaintiffs' claims for relief have been performed or occurred.

201.    **EXEMPLARY DAMAGES.** Defendants' above-described wrongful actions, inaction, omissions, and the resulting TPC plant explosions, fires, toxic emissions, and concussive shock waves were committed willfully, wantonly, and with reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs also are entitled to exemplary damages from Defendants as punishment and to discourage such wrongful conduct in the future. All conditions precedent to Plaintiffs' claims for relief have been performed or occurred.

202.    **WHEREFORE,** Plaintiffs respectfully request that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be awarded against Defendants in Plaintiffs' favor for:

a)      Economic and compensatory damages in amounts to be determined at trial including, but not limited to, general, special, consequential, loss-of-use, business loss, lost income, loss of earning capacity, relocation, mitigation, expenses, and all pecuniary damages available under Texas law in the past and future;

b)      Reasonable and necessary medical and other healthcare related expenses, testing, medical monitoring, assistance, and treatment in the past and future attributable to the injuries inflicted upon Plaintiffs as described herein;

c)      Physical pain in the past and future;

d)      Mental anguish and suffering in the past and future;

e)      Physical impairment in the past and future;

f)      Mental, psychological, cognitive impairment in the past and future;

70

**Exhibit C**                                                    APP 332
**DO NOT COPY OR ALTER - This document contains security features.**

g)      Physical disfigurement in the past and future;

h)      Risk and/or fear of developing cancer and/or other diseases in the past and future;

i)      Market-value, diminution in value, and other pecuniary damages caused by temporary and/or permanent injury/impact/contamination to Plaintiffs' real, personal, and other property interests including, but not limited to, homes, fixtures, businesses, buildings, automobiles, and/or other property interests in the past and future;

j)      Loss of use and enjoyment of the Properties caused by temporary and/or permanent injury to real or other property in the past and future;

k)      Repair, remediation, rebuilding, restructuring, and/or mitigation of real property or structural property damages, past and future;

l)      All damages available under the TEXAS WRONGFUL DEATH ACT (TEX. CIV. PRAC. & REM. CODE Sections 71.001 through 71.012, et seq.), Texas common law, and all other Texas law for the death of the deceased individual to be specified after an adequate time for discovery or at the time of trial including, but not limited to, mental anguish, loss of companionship and society, pecuniary loss, loss of advice and counsel, loss of services, reasonable and necessary funeral and burial expenses, loss of inheritance, and exemplary damages;

m)      All damages available under the TEXAS SURVIVAL STATUTE (TEX. CIV. PRAC. & REM. CODE Sections 71.021, et seq.), Texas common law, and all other Texas law for the Estate of the deceased individual to be specified after an adequate time for discovery or at the time of trial including, but not limited to, physical pain suffered by deceased until time of death, mental anguish suffered by deceased until time of death, reasonable and necessary medical expenses incurred in an effort to treat and save the deceased individual, pecuniary and economic losses, reasonable and necessary funeral and burial expenses, and exemplary damages;

n)      Exemplary damages to the fullest extent available under the law;

o)      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

p)      Court costs; and

q)      Such other and further relief available under all applicable state laws and any relief the Court deems just and appropriate.

Plaintiffs seek these damages in their individual capacities and do not seek to try their cases jointly, nor do Plaintiffs seek to try these cases jointly with any other cases, filed or unfiled.

Plaintiffs assert their individual claims for damages, including punitive damages, in an amount as allowed by TEX. R. CIV. P. 47(c)(4) as amended January 1, 2021.

71

**Exhibit C**                                                                                          APP 333

DO NOT COPY OR ALTER - This document contains security features.

## JURY DEMAND

203.    Plaintiffs respectfully demand a trial by jury on all claims so triable.

Date: January 3, 2022

Respectfully submitted,

THE FERGUSON LAW FIRM, LLP
350 Pine Street, Suite 1440
Beaumont, Texas 77701
T: (409) 832-9700
F: (409) 832-9708

By: /s/ Mark Sparks
**PAUL F. "CHIP" FERGUSON, JR.**
**Texas Bar No. 06919200**
**Email:** cferguson@thefergusonlawfirm.com
**JANE S. LEGER**
**Texas Bar No. 00788814**
**Email:** jleger@thefergusonlawfirm.com
**MARK C. SPARKS,** *Plaintiffs' Liaison Counsel*
**Texas Bar No. 24000273**
**Email:** mark@thefergusonlawfirm.com
**CODY A. DISHON**
**Texas Bar No. 24082113**
**Email:** cdishon@thefergusonlawfirm.com
**JONATHAN J. "TRIPP" JONES**
**Texas Bar No. 24097058**
**Email:** tjones@thefergusonlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

72

Exhibit C                                                        APP 334
DO NOT COPY OR ALTER - This document contains security features.

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of January 2022 a true and correct copy of the foregoing instrument has been served on all counsel of record for Defendants in accordance with the TEXAS RULES OF CIVIL PROCEDURE. The remaining defendants will be served consistent with the TEXAS RULES OF CIVIL PROCEDURE, via Rule 11 agreement, and/or the *Order* by this Court.

*/s/ Mark C. Sparks*
Mark C. Sparks

73

**Exhibit C**                                                           APP 335

DO NOT COPY OR ALTER - This document contains security features.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ashley Kaufman on behalf of Mark Sparks
Bar No. 24000273
akaufman@thefergusonlawfirm.com
Envelope ID: 60439725
Status as of 1/10/2022 2:30 PM CST

Associated Case Party: IN RE: TPC GROUP LITIGATION

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Mark Solomon | | msolomon@mwl-law.com | 1/3/2022 1:50:51 PM | SENT |
| Margaux Janda | | mjanda@mwl-law.com | 1/3/2022 1:50:51 PM | SENT |
| Tripp Jones | | tjones@thefergusonlawfirm.com | 1/3/2022 1:50:51 PM | SENT |
| Layne Walker | | lwalker@thefergusonlawfirm.com | 1/3/2022 1:50:51 PM | SENT |

Case Contacts

| Name |
|------|
| Christopher Popov |
| Stacey Vu |
| Timothy C.Shelby |
| Jessica MSkarin |
| Morris C.Carrington |
| Esmeralda Henderson |
| Amy Shadden |
| Peter Taaffe |
| Ana Davila |
| Jasmine Robinson |
| Charlotte A.Fields |
| Stuart C Yoes |
| Lisa Leyendecker |
| Richard L.Coffman |
| Brandon Monk |
| Paul Vigushin |

**Exhibit C** APP 336

**DO NOT COPY OR ALTER - This document contains security features.**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ashley Kaufman on behalf of Mark Sparks
Bar No. 24000273
akaufman@thefergusonlawfirm.com
Envelope ID: 60439725
Status as of 1/10/2022 2:30 PM CST

Case Contacts

| |
|---|
| Jay W. Brown |
| Mark C. Sparks |
| Bruce Wilkin |
| Randal G. Cashiola |
| Brent Wayne Coon |
| Gabriel Assaad |
| Jason Muriby |
| Kevin Thomas Jacobs |
| Ron Devin Harris |
| Russell Carter Lewis |
| William Ogden |
| Mitchell Toups |
| Matthew Hoffman |
| Benny Agosto, Jr. |
| Kenneth H.Laborde |
| Valerie Stefka |
| Paul F.Ferguson, Jr. |
| H JeromeGette |
| John Maniscalco |
| Mark A.Kerstein |
| Shari Welch |
| Terry Antwine |
| Reies Flores |
| Kelly Edwards |
| Amanda Zubire |

**Exhibit C** APP 337

DO NOT COPY OR ALTER - This document contains security features.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ashley Kaufman on behalf of Mark Sparks
Bar No. 24000273
akaufman@thefergusonlawfirm.com
Envelope ID: 60439725
Status as of 1/10/2022 2:30 PM CST

Case Contacts

| |
|---|
| Byron CraigAlfred |
| Johnny Alfred III |
| Sarah Williams |
| Litsy Luna |
| Janney Gordon |
| Darvi Jeffery |
| Kara Mace |
| Hart Green |
| David Oubre |
| Kathy Truong |
| John Greil |
| Gabriel Assaad |
| Anooj MThakrar |
| Stephanie Crescioni |
| Thomas J. Heiden |
| Kendall Black |
| Jason Willis |
| Jessica S.Hoffert |
| Eric Newell |
| Matt Willis |
| Carmen Scott |
| Alexander Dvorscak |
| Edward AFesteryga |
| Matthew R.Chaney |
| Renee Y.Perez |

**Exhibit C**

APP 338

**DO NOT COPY OR ALTER - This document contains security features.**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ashley Kaufman on behalf of Mark Sparks
Bar No. 24000273
akaufman@thefergusonlawfirm.com
Envelope ID: 60439725
Status as of 1/10/2022 2:30 PM CST

Case Contacts

| |
|---|
| Carmen Garcia |
| Michael J.Dority |
| Nick Brown |
| Michael Glenn |
| Kimberly Rose |
| James L.Ware |
| Harriet Smith |
| Dale B.McMath |
| Kyle E.Ludovice |
| Aaron E.Koenck |
| Kellie Kersh |
| Holly Gray |
| Jose Santos |
| Jackie Frusha |
| Ronnette VanHoose |
| Beth Morris |
| Randal Cashiola |
| Alan McMaster |
| Heather Hamilton |
| Tracy Mrozek |
| Evan Malinowski |
| Ashley Kaufman |
| P. DeanBrinkley |
| Anthony J.Livingston |
| Kevin Moscon |

**Exhibit C**

DO NOT COPY OR ALTER - This document contains security features.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ashley Kaufman on behalf of Mark Sparks
Bar No. 24000273
akaufman@thefergusonlawfirm.com
Envelope ID: 60439725
Status as of 1/10/2022 2:30 PM CST

Case Contacts

| Kai Henderson | | Kai@alfredfirm.com | 1/3/2022 1:50:51 PM | SENT |
|---|---|---|---|---|
| Ryan Reynolds | | rreynolds@butler.legal | 1/3/2022 1:50:51 PM | SENT |
| Stephen E.Garner | | sgarner@texassubro.com | 1/3/2022 1:50:51 PM | SENT |
| Sander LEsserman | | esserman@sbep-law.com | 1/3/2022 1:50:51 PM | SENT |
| B. AdamTerrell | | bterrelledoc@wgttlaw.com | 1/3/2022 1:50:51 PM | SENT |
| Mary Rose Alexander | | mary.rose.alexander@lw.com | 1/3/2022 1:50:51 PM | SENT |
| Rosie Baez Rizzi | | rosaida.baezrizzi@lw.com | 1/3/2022 1:50:51 PM | SENT |
| Michael Glenn | | michael.glenn@lw.com | 1/3/2022 1:50:51 PM | SENT |
| Patrick Edwards | | PWEdwards@awtxlaw.com | 1/3/2022 1:50:51 PM | SENT |

Associated Case Party: TPC GROUP, INC ET AL

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michael Baker | | mbaker@strongpipkin.com | 1/3/2022 1:50:51 PM | SENT |





Exhibit C APP 340

DO NOT COPY OR ALTER - This document contains security features.



State of Texas
County of Orange
   I, VICKIE EDGERLY, Clerk of the District Court in
and for Orange County, Texas, do hereby certify that the
above and foregoing is a true and correct copy of the
Original Hereof, as same as filed and appears of record
in my office.
   Witness my official seal and signature of office in
Orange, Texas, this the ____ day of _____ ____

        VICKIE EDGERLY
      Clerk of District County
      of Orange County, Texas
   by _____
        JUSTIN RHODES

**Exhibit C**